Stark v. Badger Public Service Co. 176 Wis. 600.

Stark, Respondent, vs. Badger Public Service Company, Appellant.

*February 7—April 11, 1922.*

*Electricity: Death: Negligence: Res ipsa loquitur.*

In an action against a power company for the death of plaintiff's wife, caused by electrocution from the socket of an electric lamp in the basement of plaintiff's residence supplied with electricity upon a secondary wire ordinarily carrying 110 volts, plaintiff's evidence that the deceased stood in a place where contact with a voltage of 110 would not ordinarily result in death or serious injury and that there was an opportunity for the 2,300 voltage of the primary service wires of the company to reach the secondary wires because of the company's negligence in not making reasonable repairs, is *held* to establish *prima facie* defendant's liability under the doctrine of *res ipsa loquitur,* and the burden then rests on the power company to prove that the current did not reach her through the high voltage.

Appeal from a judgment of the circuit court for Sheboygan county: Michael Kirwan, Circuit Judge.   *Affirmed.*

Action for personal injury resulting in death by coming in contact with an electric light fixture.   The defendant furnished light service to the plaintiff at his summer resort at Crystal Lake.   The primary service wires carried a voltage of 2,300 to a transformer placed on a pole on plaintiff's premises.   From this pole, after passing through a meter, service wires carrying 110 volts were strung to the various buildings of the plaintiff.   Some of these were strung parallel to and on the same poles with the primary wires.   The

transformer pole was a spliced pole, the splice being just above the surface of the ground, and the pole leaned out of perpendicular about six feet. This brought both primary and secondary wires in contact with some trees, and the insulation became worn off in places. Some of the trees were badly burned, one of about four inches in diameter being burned completely off. This condition had existed for some time and the defendant company had been notified to that effect several times. The primary and secondary wires in one place were only about five or six inches apart, and there was sufficient slack in the wires to permit them to swing together.

On the day of the accident plaintiff's wife went to the basement of the house at about 6:15 in the morning. Plaintiff, who was not yet up, heard a subdued scream and on going to the basement found his wife lying dead on the floor of the laundry near the cellar door. The basement had two rooms, the laundry and a vegetable cellar. The laundry had a wood floor laid on stringers resting on dry gravel and the cellar had a concrete floor. The door between the cellar and the laundry was open and a drop-cord which hung just within the door had had the metal light guard pulled off and the bulb broken. The guard was found at the side of the deceased.

The jury by a special verdict found (1) that the death of plaintiff's wife, Barbara Stark, was caused by a current of electricity passing into her person from the socket of an electric lamp held in her hand in the basement of plaintiff's house at Crystal Lake, which lamp was supplied with such current upon a secondary wire of the plant and system maintained and operated by defendant at Elkhart Lake for furnishing light and power to its patrons; (2) that the current which caused the death of Barbara Stark was a current of 2,300 volts; (3) that at the time when Mrs. Stark received the injury which caused her death the insulation of the aforesaid secondary wire and the insulation of the pri-

mary wire which in defendant's said system supplied electricity to said secondary wire was worn off from short portions of each of said two wires by contact with a certain standing tree, a part of which is now in evidence here and is marked Plaintiff's Exhibit 8; (4) that those parts of said two wires from which the insulation had been worn off as aforesaid were so near to each other at the side of said tree that the electric current with which the said primary wire was charged passed therefrom through said tree into said secondary wire and was thereby conducted to said lamp and its socket in the basement of plaintiff's house at the time when Mrs. Stark received the injury which caused her death; (5) that the defendant corporation, through its proper agents and representatives, had knowledge of the contact of said wires with said tree, and of their defective condition due to the wearing away of their insulation as aforesaid, during such a length of time that, in the exercise of ordinary care and diligence and before the injury occurred, the defendant should have remedied such defective condition of said wires and have thereafter prevented their contact with said tree; (6) that by the exercise of ordinary care and diligence the proper agents or representatives would have learned of the aforesaid defective condition of said wires and of their contact with said tree in time to have remedied that condition and to have thereafter prevented such contact before the time of Mrs. Stark's injury; (7) that the failure of the defendant to remedy said defective condition of said wires and to thereafter prevent their contact with said tree, before the time of Mrs. Stark's injury, was negligence on defendant's part which amounted to want of ordinary care; (8) that the negligence of the defendant which was found by the answer to the seventh question was the proximate cause of the death of Barbara Stark; (9) that there was no want of ordinary care on the part of the plaintiff, *Louis Stark,* which contributed to cause the death of his wife, Barbara Stark; and (10) damages in the sum of

$3,800. From a judgment entered in favor of the plaintiff for $3,800 and costs the defendant appealed.

For the appellant there was a brief by *Collins & Collins* of Sheboygan, and oral argument by *William B. Collins.*

*M. C. Mead* of Plymouth and *Charles Voigt* of Sheboygan, for the respondent.

VINJE, C. J.   The controversy in this case centers upon the question whether the evidence shows that the deceased was killed by a voltage of 110 or by a voltage in excess of that, owing to the defective condition of defendant's wiring.   If the voltage was normal, *i. e.* 110, then there is no liability on the part of the defendant because that is the voltage it was required to furnish.   If there was a voltage considerably in excess of that reaching the deceased, it would be liable because such excess could be produced only by reason of the defective condition of defendant's appliances.   There is a sharp conflict in the evidence as to whether or not there was an effective grounding of the wires at the meter.   That there was a grounding wire there seems well established. But the fact as to whether or not it was effective is in sharp dispute.

The gist of the argument on behalf of the defendant is that there is evidence to show that a voltage of 110 will kill; that the more credible evidence is that a perfect grounding was found to exist after the accident; that a voltage of 2,300 or thereabouts would have wrecked the whole secondary system on the island, whereas no damage was shown except a slight perforation of the fiber insulator on the socket of the drop-cord which the deceased took hold of at the time she was electrocuted.  ·  It is further claimed that plaintiff's evidence is so weak and uncertain as to there being more than 110 volts that the verdict rests in conjecture merely and cannot support a judgment.   Claim is also made that it may have been the defective condition of the drop-cord and socket that caused the electrocution.

On behalf of the plaintiff it is contended that the evidence in his behalf is certain and definite enough to sustain a verdict; that while it is admitted that death may result from contact with a voltage of only 110, yet such result is only in cases where there is a perfect connection with wet or moist ground or with some good conducting substance, and that death would not result in a case like this where the deceased stood either on the wooden floor of the laundry or else on the reasonably dry concrete floor of the cellar; that connection with a better conductive material must be shown before 110 volts will produce death. It is also claimed by plaintiff that a momentary contact with a voltage in excess of 110 or even as high as 2,300 need not necessarily wreck a secondary system, especially where, as here, the connection took place early in the morning when the system was closed except this light. These respective contentions of the parties are sustained, at least to some extent, by the expert testimony each introduced. In view of the well established rule of law applicable to the case at bar, hereinafter stated, it is not deemed necessary to further discuss the conflicting claims of the parties.

It has been stated that the defendant has argued a defect in the drop-cord or socket. We find no evidence in the record to sustain such claim. It appears from the evidence and from the cord and socket returned as exhibits in the case that both were in good condition, and no defect therein is called to our attention except the slight perforation in the fiber insulator, which perforation may have been made at the time of the electrocution. In defendant's brief it is stated:

"There was practically no mark or burn of any kind on the body discernible to the naked eye, except slight markings on one thumb, and some of the fingers of both hands, but Dr. Hopkinson, by the use of a powerful microscope on cross-sections of tissue, found electrical burns on the thumb and finger of the right hand and the index and middle fingers of the left hand."

Stark v. Badger Public Service Co. 176 Wis. 600.

It is thus established that the deceased came to her death by means of electricity—in using a drop-cord light located in plaintiff's house having a guard on it.   From the evidence it is probable the current went in at one hand and out at the other, though that is not certain, nor very material. But we have this situation:  So far as the evidence shows, the electric wiring of the secondary system within plaintiff's house and under his control was in good repair at the time the deceased received the electric shock that killed her. The evidence also shows that it was possible for the current from the primary wire to reach the secondary wire where they were only a few inches apart and where swaying by the wind would cause them to come in contact.  Under such proof the doctrine of *res ipsa loquitur* applies and it becomes incumbent upon the defendant to show that death was not caused by an excess current.    Curtis, Law of Electricity, sec. 597, states the rule thus:

"The electric current ordinarily used for interior electric illumination is of such low voltage that it will seldom cause injury though it happens to pass through one's body.   When, therefore, a person, while turning on an electric incandescent light or otherwise coming in contact with an interior wire or appliance, receives a shock which results in death or serious injury, the maxim *res ipsa loquitur* applies, and the burden of explanation is on the electric company to produce evidence showing that the excessive current was not sent to the building through its negligence."   Citing *San Juan L. & T. Co. v. Requena,* 224 U. S. 89, 32 Sup. Ct. 399, 56 Lawy. Ed. 680, affirming 4 Porto Rico Fed. Rep. 356; *Memphis C. G. & E. Co. v. Letson,* 135 Fed. 969, 9 Am. Electl. Cas. 367, 68 C. C. A. 453.   See, also, *Whitten v. Nevada P., L. & W. Co.* 132 Fed. 782, 9 Am. Electl. Cas. 179.

He further states (sec. 597) :

"In such a case it is immaterial that the electric light or immediate fixture is not under the control or management of the defendant, so long as the injurious current is carried to the building over the wires of the defendant.   Negligence

is presumed from the defendant's control of the agency which caused the injury in question, and whether or not the defendant has the control and management of the interior appliance from which incidentally the injury arose is not material," with citations as follows: See cases above cited. Compare *Union L., H. & P. Co. v. Lakeman,* 156 Ky. 33, 160 S. W. 723; *Peters v. Lynchburg L. & T. Co.* 108 Va. 333, 9 Am. Electl. Cas. 1117, 61 S. E. 745, 22 L. R. A. N. S. 1188.

He concludes the statement of the rule with this limitation:

"Where, however, it appears that the interior appliance was defective and that the defect in such appliance materially contributed to the injury, no presumption of negligence arises as against a defendant under no obligation to inspect and repair such interior appliance."

The above statement of the law we deem the proper rule to apply to the situation before us. *Turner v. Southern P. Co.* 154 N. C. 131, 69 S. E. 767, 32 L. R. A. N. S. 848 and note; *Alabama City G. & A. R. Co. v. Appleton,* 171 Ala. 324, 54 South. 638; *Abrams v. Seattle,* 60 Wash. 356, 111 Pac. 168; 16 L. R. A. N. S. 527 and note; *Indianapolis L. & H. Co. v. Dolby,* 47 Ind. App. 406, 92 N. E. 739.

Plaintiff has shown the interior fixture concerned to be in good repair; has shown that the deceased stood in a place, whether on the laundry floor or on the cement floor of the cellar, where contact with a voltage of 110 would not ordinarily result in death or serious injury, because of the poor conducting substance of the floors; has shown further that there was an opportunity for the 2,300 voltage to reach the secondary wires and that such opportunity was due to the negligence of the defendant in not making seasonable repairs. Under such circumstances we cannot disturb the verdict of the jury. It must stand because the defendant did not show that an excess current did not reach the secondary wires. Such excess may not have amounted to

2,300 volts in order to incur liability.  Any amount in excess of 110 sufficient to kill under the conditions existing would render the defendant liable.

*By the Court.*—Judgment affirmed.