A. J. WELSCH, Administrator, Appellant, v. CHARLES FRUSCH LIGHT & POWER COMPANY et al., Appellees.

**ELECTRICITY**: Negligence—Jury Question. A jury question on the issue of death from electric shock is made when the jury might find: (1) That a person was apparently in perfect health; (2) that almost immediately thereafter he was found dead, in close proximity to an electric apparatus which was capable of producing death, if overcharged; (3) that said apparatus was overcharged when the dead body was discovered; (4) that the body bore blemishes caused by electric current; and (5) that there was no other apparent cause of death.

**EVIDENCE**: Weight and Sufficiency—Inferences. An inference may be based upon an inference.

**NEGLIGENCE**: Res Ipsa Loquitur—Excess Electric Current. The doctrine of *res ipsa loquitur* will be applied to a showing that a light and power company, in attempting to furnish a householder with electricity for the fit and proper operation of domestic machinery, furnished such excess quantity as to cause death to the operator of the machinery. *In other words, the company must overcome a law-created presumption of negligence.*

**TRIAL**: Directed Verdict—"Most Favorable Construction" Rule. In passing on a motion for a directed verdict, the trial court must give to the evidence the most favorable construction that it will reasonably bear in favor of the nonmovent.

*Appeal from Buchanan District Court.*—E. B. STILES, Judge.

MAY 11, 1923.

REHEARING DENIED APRIL 4, 1924.

ACTION at law, to recover damages for the death of Florence Welsch, alleged to have lost her life through the negligence of the defendants. There was a directed verdict and judgment in favor of defendants, and plaintiff appeals.—*Reversed.*

*R. L. Bordner* and *McCoy & Beecher,* for appellant.

*Pickett, Swisher & Farwell,* for appellees.

WEAVER, J.—On and before May 26, 1919, plaintiff and his wife, now deceased, were living upon their residence property in the town of Jesup, in which municipality the defendants, or some of them, owned and operated an electric light and power plant. Some months prior to said date, defendants undertook to supply residence lights and motive power for a washing machine in the home of the plaintiff, and connection was made and wiring installed for that purpose. On the day named in May, 1919, Mrs. Welsch, being apparently in good health, undertook to perform the family washing, and in so doing, applied the power to the washing machine. She was alone, and there is no living witness who can speak with personal knowledge of all she did in and about this work. It was still early in the day when a neighbor, calling at the house, went down into the basement, where the washing machine was kept and operated, and there discovered the dead body of Mrs. Welsch lying on the floor. The power had been applied, and the machine was running. Deceased was lying at full length on her back, within two or three feet of the tub, between the machine and the stove, and within reach of the machine on the one side and the faucet for the water supply on the other. Her body was still warm, but life seemed to be extinct. There were one or more apparent burns on the finger and palm of her left hand, and a ring worn by her on that hand was discolored. The coroner holding the inquest, an undertaker having some experience in caring for bodies of persons dying of electric shock, described the alleged burn on the woman's hand and the mark on her ring, and expressed the opinion that they were caused by electric contact. He also observed a black streak across her eyeball, for which he

could not account. It appears incidentally that the coroner's jury found the death to have resulted from electric shock, though we think this was not introduced in evidence. Several witnesses describe the appearance of the woman's hand as exhibiting burns. The plaintiff, as a witness, testified that, a short time before the death of his wife, he took hold of the socket through which the electric connection was made for using the machine, and received a severe shock, causing him to fall, and to pull the socket from its place. This incident he reported to Frusch, who came and put in another socket. This alleged occurrence is denied by Frusch. Plaintiff and several other witnesses testify to investigations and experiments with the electric connection and wiring, after the death of the intestate, and unite in saying that contact with the machine produced shocks, some of them of considerable severity. Defendant says that no change or repair of any kind was made in the lighting plant or equipment after the death of Mrs. Welsch, so that examinations and investigations made thereafter would reveal the true condition of the outfit and demonstrate the safety of the connection with plaintiff's premises on the date in question. He elsewhere admits that he did change, or provide a new ground connection. He says:

"Two or three days after the Welsch accident, we put an additional ground on the neutral wire. * * * At the time of the accident, it was grounded, but I couldn't say now. It was not hitched onto the water pipe. I couldn't say it was permanently grounded. * * * I don't know in what condition that ground was in. * * * I put in this additional ground after this man Jones was down and tested out the plant. He was down after Mrs. Welsch's death, and as a result of what he told me, I put in the additional ground. The neutral wire should be grounded."

It would be of little profit for us to attempt to state in detail or at large the testimony of the witnesses, expert and nonexpert; but, so far as such recitation is necessary to an understanding of the vital issues, reference thereto will be made in a later paragraph of this opinion. The motion for a directed verdict, made after both parties had rested, assigns eight different reasons therefor. Stated in brief form, they are: (1)

That there is not sufficient evidence to justify a finding of negligence on the part of defendant; (2) that it appears from the evidence, as a matter of law, that no electric current could have been received by the deceased in excess of 220 volts; and (3) even if the plaintiff's evidence, standing alone, could be said to make a prima-facie case, "any presumption raised thereby has been overcome by the explanations and evidence of the defendant, as introduced in this case." In argument to this court, the appellee relies upon two major propositions: First, that the evidence is entirely insufficient to sustain a finding that the deceased came to her death from an electric shock; and second, that, even if the fact of death by electric shock be found, there is no evidence from which it can properly be found chargeable to any negligence on the part of defendants.

I.   Counsel say, and frequently emphasize by repetition, that there is no evidence whatever that deceased came in contact with any electrical appliance, or that such contact, if inferred from circumstances, could have exposed

1. ELECTRICITY: negligence: jury question.

her to a fatal stroke; that the agency causing the marks or burns upon her hands is not proved, but is purely a matter of inference; and that to find that her death was caused by any such inferential contact is a mere inference drawn from an inference, and does not rise to the dignity of evidence. Again, it is argued that "death from an electric shock cannot be inferred where there is no direct evidence of contact, without proof that the apparatus was charged with a current capable of producing death; and such current, capable of producing death, cannot be inferred, in the absence of direct evidence that death resulted from electric shock." This proposition is followed, however, by the admission that, where there is proof that "a current capable of producing death is on the wires in proximity to the place where a person is found dead, and circumstances are consistent with death thus caused, a jury may be permitted to infer that death was caused by an electric shock." It is also conceded that, where there is direct evidence that the deceased in fact came in contact with the electric appliances, and death resulted therefrom, "it is permissible for the jury to infer that the current

with which the deceased came in contact was capable of pro-
ducing death of a normal person."

Even if it be admitted (which we do not) that the ap-
plicable rules of law are not thus too narrowly stated, it is
exceedingly difficult for counsel to adjust their position in this
case to accord therewith. To meet that difficulty, they assert:
(1) That death "cannot be inferred, because there is no proof
of a current capable of producing death; (2) that the presence
of a dangerous current cannot be inferred, for that would be
to build inference upon inference; and (3), *even if it could be
inferred, such inference is in conflict with the physical facts,
which are controlling.*" But are these propositions sound? It
is, of course, to be conceded that, if the literal truth of the
appellees' showing be taken for granted, and it be assumed
that, at the time of the death of Mrs. Welsch, there was no elec-
tric current on the wire leading to her washing machine in ex-
cess of the safe and normal voltage which defendants had under-
taken to supply her, or if it be assumed, as counsel do, that it
was an "impossibility that the apparatus and water pipes in
the basement could have been charged with a dangerous elec-
trical current," then, of course, plaintiff has no case, and the
judgment dismissing his claim must stand. But neither court
nor jury is bound to accept as final and conclusive the defend-
ants' showing of the perfection of their apparatus or of their
scrupulous care and caution in its management, if the proved
or admitted circumstances be such as will justify reasonable men
in finding otherwise. True, the mere fact of the death of the
deceased carries with it no presumption or inference that it was
caused by an electric shock, or is attributable to the act or neg-
lect of the defendants; but if the attendant circumstances be
such as to justify a fair-minded jury in tracing the death to
such cause, the testimony of the defendants, no matter how
positive or direct, does no more than to raise an issue of fact.
The application of this general rule to the case of an alleged
death by electric shock has been often recognized, and is well
expressed in Curtis on the Law of Electricity 933, cited by the
appellee, as follows:

"Difficulty is sometimes experienced in producing sufficient
evidence to justify a judge or jury in finding that an electric

shock is the cause of the death of a person. The electric current is invisible, the indications of shock to the body may not be satisfactory, and the only witness who can tell how he received his injury may be dead. The fact that electricity was the cause of death may, like most other facts, be proved *by circumstantial evidence,* if there is no direct primary evidence procurable. In civil cases, a litigant is not required to prove his right to recover beyond a reasonable doubt; all that is required is that evidence be produced which indicates with reasonable probability the truth of the party's contention. Where a person is found dead in proximity to an electrical appliance, contact with which is capable of producing death, and no cause for his death other than the electric current is presented, the jury may be authorized to find that death was caused by an electric current, passing from the appliance. The inference that death was the result of electricity passing from the appliance is strengthened by evidence of a burn on his body or clothing such as might result from electric shock, or by exclamations or screams uttered by the deceased at the time of the injury.''

Quoting this statement, counsel italicize the words ''capable of producing death,'' as marking its want of applicability to the case before us, in that, as claimed by them, there is no evidence that contact with the electrical appliances in the basement of plaintiff's home was capable of producing death. This proposition is based on the showing made by defendants that the electric connection between its plant or primary wires and the basement of plaintiff's home was so made or gauged as to deliver there no more than 110 volts,—at the most, 220 volts,—and that such a supply was insufficient to produce material injury to a person coming in contact with it. That such was the plan and purpose of the equipment may readily be admitted; but whether the plan worked perfectly, or whether, by any accident, omission, or defect in the details or maintenance of such connection, it was possible for the wires in the basement to become overcharged with a dangerous current, cannot be assumed, as a matter of law, as against evidence of a circumstantial character, tending to show such dangerous condition. It appears without dispute that defendants' plant was the only source supplying electric light and power in that neighborhood; that they were

receiving over their primary wires something like 2,300 volts,—a dangerous volume,—transmitting it through the town, and by the aid of transformers and other devices, distributing it to their customers. The secondary wires through which the current was delivered to the homes and shops having such service were strung on the same poles, and within 30 inches of the main or primary wires which carried the current in death-dealing quantities. · Humanly speaking, there appears to be no possible source of electricity upon the secondary or service wires except that with which the primary wires were loaded. If, then, the circumstances of this woman's death be such as to fairly indicate that it was caused by electricity, and no primary or direct evidence be procurable, then, to use the language of Mr. Curtis, it is sufficient if the evidence be such as "indicates with reasonable probability the truth" of the charge that it was so produced. That such a finding is justifiable is supported by all human probabilities and experience. Here is a woman in the prime of life, in apparent good health, engaged in the discharge of her ordinary work. The evidence shows that, only a short time—not to exceed an hour—before she was found prostrate and dead upon the floor beside her washing machine, and evidently after she had begun her washing, she had gone to the defendants' office, complaining or reporting that, when she put her hands in the water, it caused a "tingling" sensation, and was advised to lay down a dry board on which to stand when she was wringing out the clothes. Her death must have followed this incident within a few minutes, and it appears that a board was found on the floor by the tub, as if she had followed the advice given her. The witness who discovered the dead body testifies that the machine was running at the time; that he reached to the switch and turned off the power; and that, although not in contact with the machine, he received a "good strong shock." There was, as we have already noted, the appearance of a burn upon the palm of the woman's hand and finger; also, a mark or discoloration upon the ring on her hand. The burn is shown by the testimony of several different witnesses. The principal defendant, as a witness before the coroner's jury, admitted seeing it, but expressed the conclusion that it looked older than it

would have appeared, had the burns been recent. Being pressed for more explicit statement, he said:

"Well, I would think it, if it happened this morning, that she either pressed it or burnt it, and, of course, burnt—undoubtedly, if she burnt it, it undoubtedly happened from the electrical current; but I took hold of the iron as I did there, and even before you came, and the same voltage is still on the wire,—there is no difference on the voltage,—it don't hardly seem possible it could be a burn while we felt no ill effects from it."

The coroner, speaking from alleged experience and observation, pronounced it an electric burn. That the admitted and proved circumstances were sufficient to indicate death by electric shock seems hardly open to doubt. The sufficiency of a similar showing is sustained by many precedents. For example, in *Duncan v. Fort Dodge Gas & Elec. Co.*, 193 Iowa 1127, 1130, the defendant's denial of an overcharge of electricity and its assertion of the perfection and safety of the system were fully as strong and as positive as in this case. We there said:

"Except for the appellant's insistence that there was no overload or dangerous current upon the wire supplying electricity to the fan, all the circumstances attending the tragic ending of the young man's life, as detailed by all the witnesses on both sides who were present and speak from personal observation, are consistent with plaintiff's theory in this respect. There was a current of electricity of some degree of strength upon the wire; the hand of the deceased clasped or rested upon the fan; with that grasp, his form became rigid, his tongue became speechless; upon the release of the current, the tension of his muscles relaxed, and he began to slide or crumple toward the floor; there was testimony tending to show an electric burn upon his hand, and also that his dead body exhibited the appearance characteristic of those who have been killed by electric shock. All these things, coupled with an affirmative showing that the deceased, up to that moment, exhibited all the appearance of unimpaired health, and the entire absence of evidence of death from any other cause, make up a state of circumstances which forbids us to hold, as a matter of law, that death by electric shock was not established."

Except in the fact that there was direct evidence that de-

ceased laid his hand upon the electric appliance, the essential circumstances were strikingly similar to those in the instant case; but proof of the contact, no less than proof of any other material fact, may be made circumstantially. Here was an electric appliance, and here was an active current of some degree of strength, necessarily showing a connection with the power which was being furnished by defendants. Here the deceased was, in fact, using the appliance, and that she was coming in contact with the current is shown by defendants' own evidence of her complaint, a few minutes before her dead body was discovered at the very place where she was attempting to make use of the current; and there was not the slightest evidence of her death or injury from any other cause; and surely, the conclusion or finding of death from electric shock from such a combination of circumstances is neither unnatural nor unreasonable. Not unlike this case in principle, though much less persuasive in its circumstances, is the case of *Carpenter v. Security Fire Ins. Co.*, 183 Iowa 1226, to recover insurance upon a horse alleged to have perished by lightning stroke; and plaintiff was allowed to recover, although no witness saw the killing, and the death from such cause was established by the circumstance that the horse was shown to have been sound and in good health shortly before the occurrence of a thunderstorm, and shortly thereafter, its dead body was found in the pasture, under conditions giving no evidence of disease or death from other cause. Discussing the case, the court, by Gaynor, J., said:

"Whenever the evidence presented in support of any contention is such that it may, when fairly and honestly weighed and considered, produce a conviction in the mind that the fact exists as contended for, it becomes a question for the determination of the legal triers of fact."

In the same case, it is further said:

"The jury is bound to gather the truth from the evidence. If the theory which includes liability finds support—rational and reasonable support—in the evidence, the fact that reasonable minds might differ as to which of the two theories is better supported by the evidence, does not justify the court in taking the case from the jury."

Quite in point, also, is the case of *Suburban Elec. Co. v.*

*Nugent,* 58 N. J. L. 658 (34 Atl. 1069), where there was no eye-witness of the death of deceased, a member of the city police force, whose body was found at the foot of an electric light pole, and the only evidence as to the cause of his death was such as was derived from the location of his body and the fact that upon the pole, at about the height of a man's head, was an uninsulated wire rope, charged with electricity, and the added circumstance that a post-mortem revealed no evidence of disease. There was a burn upon his hand, and other physical indications of death by electricity. There was no direct proof of contact, and no evidence that deceased had any occasion to touch the wire rope. And of this situation the court says:

"These facts, unexplained, not only make it reasonable to suppose that the decedent came to his death through having touched with his hand the uninsulated wire upon the reel which was fastened to the defendant's electric light pole, and thereby received a fatal shock, *but exclude any other inference.*"

Further citation of authority at this point would seem to be superfluous. Possibly, however, it is as pertinent here as anywhere to refer to appellees' frequent appeal to the so-called rule which forbids "building inference upon inference." The phrase so quoted is one of the many sayings having a legitimate use in some phases of legal discussion, but not rising to the dignity of a universal rule of evidence, and often mistakenly applied or cited in support of an effort to exclude or neutralize competent circumstantial evidence. In proving or disproving any alleged fact by circumstantial evidence, inference is often legitimately drawn from facts established by other inferences. Indeed, if we exclude *all* inferences which depend in *any* degree upon other inferences from established or admitted fact, very little human testimony would ever reach the ear of court or jury. Says Mr. Wigmore:

2. EVIDENCE: weight and sufficiency: inferences.

"It was once suggested that an 'inference upon an inference' will not be permitted,—i. e., that a fact desired to be used circumstantially must itself be established by testimonial evidence; and this suggestion has been repeated by a few courts, and sometimes actually enforced. There is no such rule; nor can there be. * * * All departments of reasoning, all scientific

work, every day's life, and every day's trials proceed upon such data. The judicial utterances that sanction the fallacious and impracticable limitation, originally put forward without authority, must be taken as valid only for the particular evidentiary facts therein ruled upon.'' 1 Wigmore on Evidence, Section 41.

Ordinarily, proof of a material fact is not accomplished by inference from any one isolated incident or circumstance, but by the combination or aggregation of many related circumstances, each lending more or less support to the other and to the conclusion sought to be established. If some of these contributing circumstances are themselves shown only as matters of inference from other circumstances, it may justify the triers of fact in considering it as diminishing the weight or value of the conclusion or final inference, if it may be so called, but does not render it inadmissible. An analogous case is found in *Taylor v. General Acc. Assur. Corp.*, 208 Pa. St. 439 (57 Atl. 830), where the plaintiff relied upon evidence tending to show the good health of the deceased, as affording presumption or inference that his injury was caused by accident. The court there says of such fact:

''It is not a mere presumption in any other sense than that all facts not mathematically demonstrable are more or less presumptions; it is a fact proven by every circumstance indicative of it. It was competent, therefore, for the jury, having found it as a fact, to base upon it the inference that the cause of the fall was accidental. Nor is its availability for that purpose necessarily impaired by the decedent's intimation that he did not know how he came to fall.''

Giving the rule contended for by the appellees all the force to which it is properly entitled, we still hold that the evidence was sufficient to make the issue whether the deceased died from electric shock a question for the jury.

II. Assuming, then, that plaintiff made a sufficient showing for the jury to find that the deceased died from electric shock, the one further material inquiry is whether he made a case from which the jury could find defendants chargeable with negligence in respect thereto. If the defendant company undertook to main-

3. NEGLIGENCE: *res ipsa loquitur*: excess electric current.

tain a system of lighting and power by electricity, it was charged
with the duty of supplying the current to its patrons, including
plaintiff and his wife, in a voltage proportioned to the service
to be given, which is shown to have been a current for ordinary
light bulbs and power for the operation of the family washing
machine.  This, the principal defendant and his witnesses tes-
tify, called for a supply of 110 volts, which might be subject
to slight variations at times, of very few volts.  Testifying be-
fore the coroner's jury, they say that the normal supply to
plaintiff's premises was 110 volts, and that, while it would
be possible for him to increase the voltage to 220, this had to
be done by climbing a pole and connecting another wire, and
that, without such manipulation of the wires, he could not de-
liver more than the normal quantity of 110 volts.  There was
some other evidence, not entirely clear, that the voltage might
be run up to 220, but that in neither instance was the charge a
dangerous one, or liable to destroy human life.  It further ap-
peared by the defendant's evidence that it would require some-
thing like a charge of 1,000 or more volts to deliver a fatal
stroke.  If it were found, as we hold it might be, under the
evidence, that this woman was killed by electric shock, it fol-
lows of necessity that in some way the wiring extending into
and through the basement of the house was overloaded with an
excessive and dangerous current, much in excess of the normal
and safe supply.  An accident so occurring speaks for itself,
and demonstrates the existence of a defect in the plant or in its
care and management, and casts upon the defense the burden
of its explanation upon some theory consistent with its exercise
of due care.  Such was our holding in the *Duncan* case, supra.
There we approved an instruction to the jury that, if the death
of deceased was caused by electric shock from a current of an
excessive and dangerous voltage that escaped or was trans-
mitted from defendant's wires into the building, and it was fur-
ther shown that deceased was free from contributory negligence,
such facts were sufficient to establish a prima-facie case of neg-
ligence against the company, and if not sufficiently rebutted,
would warrant a finding that defendant was negligent.

In passing on this phase of the record, we further said that
some members of the court did not approve of the use of the

phrase "prima-facie evidence;" but that, in view of the fact that, "if Ora Duncan was killed by an overcharge of electricity escaping from the primary to the secondary wiring, * * * the case clearly falls within the scope of the rule as to *res ipsa loquitur*, the error, if any, in such instruction was without prejudice." In discussing this question, we further said: "That this must be so is clearly apparent."

The company's primary system was the only source of supply of electricity to the plaintiff's premises. The woman could not have been killed by it, were the secondary wiring not dangerously overloaded. The overload, if any, must have been communicated from the primary wires, and the fact of such communication is evidence of a defect in the system,—not perhaps a necessary, but at least a natural, conclusion which the jury might properly reach, in the absence of sufficient rebutting explanation. The doctrine is well stated in *Royal Elec. Co. v. Heve*, 11 Quebec (K. B.) 436, where it is held that the electric company is bound to diligence proportionate to the peculiar character of the commodity in which it deals, and is liable in damages for the death of one receiving a fatal shock from an ordinary electric light bulb, *even though the cause of the unusual intensity of the current is not clearly established, since presumptively the extra electricity came over the same system, from the same source, as that from which the ordinary supply was delivered.* It is also given clear expression by Mr. Curtis in his work on Electricity, Section 597, cited by the appellee, as follows:

"The electric current ordinarily used for interior electric illumination is of such low voltage that it will seldom cause injury though it happens to pass through one's body. When, therefore, a person, while turning on an electric incandescent light, or otherwise coming in contact with an interior wire or appliance, receives a shock which results in death or serious injury, the maxim *res ipsa loquitur* applies, and the burden of explanation is on the electric company to produce evidence showing that the excessive current was not sent to the building through its negligence" (citing in support of this rule, *San Juan Lt. & Trans. Co. v. Requena*, 224 U. S. 89, and other cases).

The case cited from the United States Supreme Court is

quite parallel with the one at bar. The system of lighting there described was substantially the same as we have here to deal with.

"There were," says the court, "no outside electric wires in that vicinity save those of the defendant, and the increased and dangerous current could only have come from its primary wire."

Among other things, the trial court there charged the jury that, if it should find from the evidence that "the deceased came to his death while innocently and without knowledge of any danger using an incandescent light, the current for which was furnished, to which the electricity was supplied, by the defendant company, the presumption is that the electric company was negligent; and it devolves upon it to show that the surplus and dangerous current that came over the wires did not occur from any negligent act on its part." Exception was taken to this instruction on the ground that it erroneously applied the doctrine of *res ipsa loquitur*. The Supreme Court overruled the exception, saying that, while the language was not to be commended as a model, it was not erroneous as applied to that case, and added the general proposition stated as follows: That, when the thing causing injury is "shown to be under the exclusive control of the defendant, and the injury is such as in the ordinary course of things does not occur if the one having such control uses proper care, it affords reasonable evidence, in the absence of an explanation, that the injury arose from the defendant's want of care" (citing in support of the rule many precedents, including numerous cases involving the supply and use of electricity).

In *Stark v. Badger Pub. Serv. Co.*, 176 Wis. 600 (187 N. W. 651), the court had to deal with an instance similar to the one before us, where the victim of the accident was a housewife, at work alone in a basement laundry. There was no immediate witness. The husband, in another part of the home, heard a scream, and going to the basement, found his wife lying dead on the floor of the laundry. The only evidence that the woman had come in contact with the current was in the showing that in the doorway near where she was lying was an electric drop cord, which had the metal light guard pulled off, and the

broken bulb was found at her side. There was some evidence
of defects or imperfections in the wiring. The court cites ap-
provingly the application of the doctrine of *res ipsa loquitur* as
stated by Mr. Curtis, together with many precedents to the same
effect from other jurisdictions.

Without further extending this opinion for quotations from
the precedents, we cite, as approving the application of the *res
ipsa* doctrine to cases of this kind, *Alexander v. Nanticoke Light
Co.*, 209 Pa. 571 (58 Atl. 1068) ; *Bice v. Wheeling Elec. Co.*, 62
W. Va. 685 (59 S. E. 626) ; *Wheeler v. Northern Ohio Traction
Co.*, 27 Ohio Cir. Ct. 517 ; *Delahunt v. United Tel. & T. Co.*, 215
Pa. 241 (64 Atl. 515) ; *Thomas v. Electric Co.*, 54 W. Va. 395 ;
*Drown v. New England Tel. & T. Co.*, 80 Vt. 1 (66 Atl. 801) ;
*Walters v. Denver Consol. Elec. Lt. Co.*, 17 Colo. App. 192 (68
Pac. 117). See, also, list of authorities cited by us in the *Duncan*
case, 193 Iowa 1127, at 1132.

The general doctrine of these cases and of the reasons there-
for is discussed in very clear and satisfactory terms by the
Pennsylvania court in the case of *Alexander v. Nanticoke Light
Co.*, supra. Indeed, while no court goes to the extent of holding
that an electric company is an insurer of its patrons or others
against all danger of accident or injury from its operations, they
all agree that it is bound to a very high degree of care, pro-
portioned to the danger which inheres in the production and dis-
tribution of this tremendous energy, the nature of which is
such that it can be safely used only when subjected to the most
perfect control which human ingenuity has devised. The patron
has no right to interfere with the producing plant. He must
rely for his safety upon the competence, vigilance, and care of
the company to maintain the guards which science and experi-
ence have found essential to protect the service wires against
an overcharge of the current escaping from the primaries. When
this is done, the patron is, to say the least, reasonably safe.
When it is not done, the hidden menace of death or serious in-
jury is ever present, and ordinarily is not revealed except by
some sudden stroke, against which the victim is powerless. It
is, therefore, no unjust hardship upon the producer or distribu-
tor to hold him to the duty of making explanation of the pres-
ence of an excessive voltage sent into a patron's building, upon

some theory consistent with the exercise of the required degree of care.

This well established rule compels us to hold that the trial court erred in directing a verdict. It should, perhaps, be noted in this connection that defendant expresses the opinion that plaintiff's motor operating the washing machine was defective. This does not seem to be very material; for such defect, if any, could not operate to increase the voltage which was being supplied by the company. In this connection, the appellees cite and rely upon the case of *Harter v. Colfax Elec. L. & P. Co.,* 124 Iowa 500; but, as we had occasion to point out in *Duncan v. Fort Dodge Gas & Elec. Co.,* 193 Iowa 1127, 1138, the cited precedent is readily distinguishable from the case now in hand. There the injury to the plaintiff was caused by the falling of an electric lamp fixture, insecurely suspended from the ceiling of a hotel bathroom. The fixture was a part of the interior wiring and lighting system provided by the proprietor of the hotel, and its defect was not chargeable to the electric company; but in the present case, the evidence tends to show that, if the death of the deceased was caused by electric shock, it was the result of an overload or excessive current, having its origin in the primary system which was under the exclusive control of the defendants.

III.    It is to be remembered, in all cases of appeal from judgment upon a directed verdict, that this court is required to give to the record of evidence the most favorable construction that it will reasonably bear, in support of the appellant's case. Not that this court will hold the testimony offered in his behalf to be true, as a matter of law, but it must hold that the jury may believe it true; and a verdict cannot properly be directed thereon if, accepting its truth, it is sufficient to justify a finding in appellant's favor. In the present case, the motion to direct a verdict was not presented until both parties had put in their evidence, and rested. Now, while there are cases in which such practice is admissible, it is ordinarily not to be commended; for it is very difficult for a trial court, no matter how able or experienced, to pass upon the questions so raised without being unconsciously swayed in some degree by its impressions of the weight

*4. TRIAL: directed verdict: "most favorable construction" rule.*

and value of the conflicting testimony,—a function which belongs to the jury.

In writing this opinion, we have not attempted any full or complete statements of all the testimony on either side of the controversy, nor to deal with all the theories advanced by the respective counsel, but have given our attention to such features of the record as have seemed to us decisive of the appeal. In view of the fact that a new trial is inevitable, we have no opinion to express on the merits of the case, other than as involved in the simple question whether plaintiff made a case for the jury.

For the reasons stated, the judgment below is reversed, and cause remanded for a new trial.—*Reversed and remanded.*

PRESTON, C. J., STEVENS and DE GRAFF, JJ., concur.