## M. E. BAUMANN v. INTERSTATE POWER COMPANY.[1]

January 12, 1934.

No. 29,712.

*Briggs, Weyl & Briggs* and *Huffman & Smith,* for appellant.
*Pegelow & Bargen,* for respondent.

HILTON, *Justice.*

In an action to recover damages for the wrongful death of a minor, plaintiff, the administratrix of his estate, had a verdict. Before submission of the issues to the jury defendant moved for a directed verdict and after the return of the verdict moved for judgment notwithstanding. The appeal is from the judgment entered. The amount of the verdict is not in controversy.

[1]Reported in 252 N. W. 222.

On May 25, 1932, Edward John Murray, an Indian boy 17 years of age (plaintiff's intestate) was employed by S. J. Neises to clean out rubbish from the basement of his store at Cass Lake. Edward's brother and another boy were aiding him in the work. There was an open air vent in the basement but no windows. About two-thirds of the basement floor (the front part thereof) was covered with concrete; the balance with boards, with no space between them and the ground. Because of the rubbish that had been thereon the boards were damp. Two electric insulated wires, usually called "outside wiring," ran parallel along the ceiling of the basement; one was a "hot" wire, the other neutral. Three sockets were connected to them. The two sockets in the front portion of the basement had bulbs, which were lighted while the boys were at work. The socket in the rear of the basement had no bulb. Edward's brother, the only eyewitness called, testified that Edward, standing on the boards, had in his hand an extension cord with a bulb on one end of it. He apparently intended to make a connection so that the bulb could be lighted. He passed the cord over the two ceiling wires, and in withdrawing his hand it either touched the "hot" wire or came very close to it. He stiffened, called for help, and sagged against a near-by post, remaining unconscious thereafter. One of the boys called Mr. Neises, who came down and attempted to get Edward free from the wires. The two lights remained burning. The other boy ran upstairs and turned off the switch, and Edward fell to the floor. He was at once carried upstairs.

Dr. House was immediately called and arrived on the scene promptly. He found fibrillation of the heart and paralysis of the respiratory system, results of electrical shock. He also found a small burn on the second finger of the right hand about three-eighths of an inch in length. Heat was applied by blankets and hot water bottles. By an epinephrin injection into the heart he succeeded in reviving and maintaining blood circulation for four hours. He applied the Schaeffer method of artificial respiration and continued it until near midnight. Edward died sometime between that time and the time of the accident, which occurred about 4:30 p. m. The doctor made a test of the blood and found it to be fluid, having lost

its coagulative ability, which, he testified, is a characteristic of extensive electrical shock.

Defendant manufactured electric current for power and lighting purposes in its generating plant at Bemidji, Minnesota. It transmitted current to Cass Lake, Minnesota, and other places at 33,000 volts. At Cass Lake such current was reduced to 2,300 volts through a transformer before being placed on the primary wires of its distribution system at Cass Lake, and this voltage was in turn reduced through another transformer to 115 volts for distribution over its secondary system to the premises where the current was used. Among others in Cass Lake it furnished current to Neises' store; the current contracted for was 115 volts.

The transformer last mentioned was attached to a pole located in an alley two blocks west of Neises' store. Close to the top of the pole was a cross-arm pointing north and south, to which were attached the two primary wires running east and west and carrying 2,300 volts. Just below that cross-arm was another cross-arm carrying two "jumper" wires extending vertically from the primary wires down to that transformer. About a foot below that arm was a rack bearing three wires, two of which carried a current of 115 volts each, the one in the center being a neutral wire. Over these wires current was transmitted to the south. Below that rack and on the north side of the pole was another rack bearing the three service wires transmitting current to the east and west. Another set of three service wires extended from that rack to a rack located at the top of a telephone pole. The transformer is located below the lower of the racks bearing the service wires. The "jumper" wires carry the 2,300-volt current from the primary wires at the top of the pole down on the north side of the pole to the transformer box. The two "jumper" wires pass the secondary wires, and, being on the north side of the pole, pass, with a little clearance, the secondary wires extending eastward in the direction of Neises' store.

The complaint alleged negligence on the part of defendant in permitting a current of approximately 2,300 volts to enter upon the secondary wires and over the basement wiring, thus proximately causing the death of plaintiff's intestate. The answer put in issue

that allegation, asserted negligence on the part of the store proprietor in the maintenance of the basement wires which were within his exclusive control, and alleged contributory negligence on the part of deceased. All issues were submitted to the jury.

The evidence as to the condition of the insulation on the basement wires and the condition of the basement itself was in conflict. Witnesses for defendant testified that the wires were damp; those for plaintiff testified they were dry, there being dust and cobwebs on them. The boards upon which Edward was standing, however, were damp.

Testimony of plaintiff's expert witnesses tended to show that the insulation on the "hot" wire was in good condition after the accident except at the point of contact with deceased's hand, at which place the insulation appeared to have been disturbed, was thinner and gummy, showing evidence of having been subjected to heat. There was a small puncture in the insulation at that place. There was testimony indicating that the puncture had been made by electricity. The insulation was three-braid and weather-proofed, recommended for outside use and for transmitting current up to 600 volts, but as a safety feature was insulated to withstand a much greater voltage. A section of the wire in question (an exhibit) about five feet in length, including the place where it had been punctured, was cut out and taken to the General Electric Company's plant in Minneapolis, where two "break down" tests were made. The experts who made them testified that the first test was made of a portion of the wire where the insulation had not been affected by the old break. A low voltage was at first applied and gradually increased to 1,700 volts, when the current broke through the insulation. The second test included the portion of the wire where it had already been punctured. The current broke through at 580 volts and at a point 1/16 of an inch from the old break.

Testimony on the part of defendant's witnesses was to the effect that a few hours after the accident and also two days thereafter there was a leakage of from 40 to 64 volts at or near the place where deceased had grasped the wire; two witnesses testified that they

stood at the same place deceased had stood and grasped the wire at the same, or approximately the same, spot that he had, and that they received a shock.

On the evidence the jury could well find that the insulation on the basement wires was in normal condition and sufficient to withstand a current considerably in excess of 115 volts. It was also for the jury to determine whether the wires and basement were damp or dry and as to what the atmospheric condition therein was.

The finding of the jury that the wires and the insulation were in good condition in itself is an indication that excessive current passed over the basement wires. In addition, Dr. House and one of plaintiff's electrical experts testified that in their opinion Edward's death was caused by a current of high and dangerous voltage, approximately 2,300 volts. The doctor based his opinion upon his conclusion that the respiratory or nerve centers of the brain had been destroyed, stating that the destruction of those centers was a usual result of shock by excessive current. He also stated that in cases of shock by electricity of approximately 115 volts, where the contact with the current had been broken promptly and efforts to resuscitate made promptly, as here, such efforts were usually successful, the success or failure depending to some extent upon the physical condition of the person shocked. He testified that Edward was a robust and healthy young man. Expert medical witnesses, one on each side, were in accord that electricity of a high voltage may enter a body without leaving an extensive burn or no burn at all at either the place of entry or of exit. Defendant's medical witness, however, was of the opinion that an extensive burn is caused more often by a current of high voltage than by one of low voltage. This witness admitted that respiratory centers of the brain are not so likely to be paralyzed by a low voltage current as by one of high voltage. On this evidence the jury was justified in finding that Edward's death was caused by a current having a voltage of approximately 2,300 volts.

The transmission of current into the basement and over the wires therein was under the exclusive control and management of the defendant. The jury having found the insulating qualities of the

basement wires to be normal and that approximately 2,300 volts were on those wires at the time of the accident, application of the *res ipsa loquitur* rule was proper. The court gave that rule in these words:

"Where the thing causing the accident is shown to be under the control of the defendant and the accident is such as in the ordinary course of things does not happen if those who have the management use due care, it affords reasonable evidence, in the absence of explanation by the defendant, that the accident arose from want of such care."

Before so charging the court instructed the jury that that rule could not be applied unless and until they should find that the accident was not caused by the voltage contracted for and defects in the basement wiring.

To avoid liability it was incumbent upon defendant to make the required explanation. We think it failed in that regard. Manifestly the excessive voltage came from the primary wires to the secondary wires. Whether such a condition resulted from a defective transformer or actual contact between the "jumper" wires and the secondary wires, or otherwise, was not necessary in this case for plaintiff to prove. The inference or presumption raised by the *res ipsa loquitur* rule made it unnecessary for plaintiff to prove specific acts or omissions constituting negligence on the part of defendant. See, generally, Gilbert v. Duluth G. E. Co. 93 Minn. 99, 100 N. W. 653, 106 A. S. R. 430; Goar v. Village of Stephen, 157 Minn. 228, 196 N. W. 171; Fitch v. City of Blue Earth, 180 Minn. 125, 230 N. W. 469; Stark v. Badger P. S. Co. 176 Wis. 600, 187 N. W. 651; Duncan v. Ft. Dodge G. & E. Co. 193 Iowa, 1127, 188 N. W. 865; Welsch v. Charles Frusch L. & P. Co. 197 Iowa, 1012, 193 N. W. 427; Orr v. Des Moines E. L. Co. 207 Iowa, 1149, 222 N. W. 560; San Juan L. & T. Co. v. Requena, 224 U. S. 89, 32 S. Ct. 399, 56 L. ed. 680, 20 C. J. p. 380, § 63.

There was ample evidence justifying the jury in finding that deceased was not guilty of contributory negligence.

We have carefully examined the record and find no reversible error in the admission of evidence.

Affirmed.