MANUEL KAPROS, Plaintiff in Error, v. PIERCE OIL CORPORATION.—
25 S. W. (2d) 777.

Division One, March 5, 1930.

*Walter F. Stahlhuth* and *Hensley, Allen & Marsalek* for plaintiff in error.

994

*T. M. Pierce* and *Samuel H. Liberman* for defendant in error.

ELLISON, C.—Action for damages laid at $25,000 for personal injuries sustained by the plaintiff from a fire which occurred at defendant's oil filling station while plaintiff was there purchasing gasoline. Plaintiff lost on the trial below and judgment went against him on the verdict. The case is here on a writ of error issued at his instance. The sole error assigned is the giving of two instructions for the defendant which cast the burden of proof on the plaintiff. It is claimed the doctrine of *res ipsa loquitur* applied to the case, and that these instructions were therefore wrong, because under that doctrine the burden was on the defendant to explain the

casualty. The issue presented requires a rather full statement of the facts.

After setting out matters of inducement the petition charged general negligence as follows:

"That the defendant carelessly and negligently caused and permitted one of its tanks of gasoline and pumps and hose and premises adjacent thereto, then and there under defendant's sole and exclusive control, and close to which plaintiff was standing while engaged in purchasing gasoline from defendant as aforesaid, to suddenly become ignited and explode and burn, causing and permitting the flames to come in contact with and against and upon plaintiff's body and clothing, whereby and as a direct result of which plaintiff was painfully and seriously burned," etc.

The answer contained a general denial and a further allegation that the injuries, if any, suffered by plaintiff were caused by his own negligence, in that plaintiff, while on the premises of defendant and while gasoline was being put into the tank of plaintiff's automobile, struck a match or matches and thereby caused gasoline to ignite. The reply was a general denial.

The plaintiff testified, in substance, that at about 5:30 or six o'clock on the evening of December 2, 1923, he stopped his automobile at defendant's oil filling station, located on the southwest corner of Twelfth Street and Chouteau Avenue in the city of St. Louis. With him were a Mrs. Holloway, Mr. and Mrs. Pappas and their two small children and a Miss Summers. There were two pumps at the station, in line north and south with each other, and some twenty feet apart, and two driveways for motor vehicles, one being on the east side of the pumps and the other on the west side of them. Plaintiff, approaching from the south on Twelfth Street, drove in over the eastern driveway leading from Twelfth Street and stopped his car headed north with its rear end close to or one and a half feet beyond the north pump and some two and a half to three feet out from the same.

It was about dark and the incandescent lights of the station building were on. The plaintiff shut off his engine and turned out the lights on the car. He next got out of the driver's seat on the west side of the car and went around the car and pump to the right or east side of the car. Upon being asked by the station attendant how much gasoline he wanted, he said (so he testified), "Fill 'em up." The attendant removed the filler-cap located at the right rear end of the body of the car, inserted the hose-nozzle into the tank, returned to the pump and proceeded to discharge gasoline from the pump into the tank through the connecting hose. Plaintiff was then on the right side of the automobile and two or three feet back of it, facing east or northeast.

After standing there a few minutes the plaintiff discovered fire blazing about his feet and upon the ground back of him. The driveway had a cinder or gravel floor, "something like that." The fire started on the ground near the pump and came toward him. He couldn't say whether the ground was wet or dry before the fire started. He seized the hose, drew it out of the car tank, and, to prevent it from communicating fire to the pump, threw it down upon the ground, shouting to the occupants of the car to get out. The bottom of his trousers were on fire and he was severely burned on his leg. He testified the fire he saw was all-around upon the ground, but that he saw none on the pump, the hose or the gasoline tank; that he lighted no matches and was not smoking; and that he heard no explosion.

Mrs. Holloway, who had remained in the car, testified she noticed the reflection of fire in the windshield and then heard plaintiff call to them to jump out. She immediately did so. At that time the fire was three feet back from the car and was running towards it on the ground. She heard no explosion, saw no fire on the pump or anywhere except on the ground.

Albert Amad, who saw the fire from his store on Chouteau Avenue, ran across the street to plaintiff and extinguished the fire upon him. He testified the fire was on the ground north of the north pump and back of the automobile and extended perhaps seven feet toward Chouteau Avenue. He heard no explosion and saw no fire on the pump, the hose or gasoline tank, or anywhere except as stated.

Tom Pappas left the automobile when he heard plaintiff's warning. The fire was then three or four feet in back of plaintiff's automobile, but the machine was not on fire. He said there was no explosion and that the only fire he saw was on the ground.

The testimony for the defendant was, in substance, as follows:

Joseph Shanzmeyer, defendant's station agent, said when the car came into the station he removed the cap from the gasoline tank, inserted the nozzle of the hose into the tank and asked plaintiff how much gasoline he wanted. The plaintiff went to the rear of the car and struck a match to look at the indicator on his tank, whereupon the witness warned him not to strike matches, that it was dangerous. The plaintiff stepped back a few feet and said, "Give me ten gallons." The witness put five gallons into the tank and pumped another five gallons into the bowl of the pump, and when the last five gallons were just about all in the tank of the car, the plaintiff struck another match to look at the indicator again Gasoline vapor from the tank opening ignited, and a flame went up to about the height of the top of the car.

The witness said he was closing the valve of the pump when the plaintiff took the hose and jerked it out of the tank, spilling the

burning gasoline all over, and threw the hose in such a manner that the end of it struck a box of bottles standing in the center between the two pumps, thereby splashing gasoline all over the place. The whole ground and everything was on fire, and plaintiff had spilled some gasoline on himself which was also burning. The witness ran into the station house, got a fire extinguisher, and put out the fire on the rear of the car. He then pushed the car away from the rest of the fire still burning on the ground. He testified that neither of the station's pumps nor gasoline tanks or other equipment was on fire. He had worked at this filling station since July, 1922, and with this north pump involved in the accident, but had never had any ignition or explosion in the pump.

On cross-examination he said the indicator at which plaintiff looked was on the tank of his car; that the station was lighted, but that a trunk on the back of the car cut the light off from the indicator. The plaintiff was several feet from the tank when he struck the first match, and a foot and a half or so when he struck a match the second time. The last of the gasoline was going out of the bowl when plaintiff struck the second match. The witness was standing on the little concrete platform of the pump some three and a half feet square, to close the pump valve, and was just turning it off when plaintiff jerked the hose out of the car. Gasoline was still in the hose; it was filled with gasoline. The gasoline was spilled over the driveway back of the car, but there was no fire on the base or elsewhere on the pump. It was on the ground only. The first fire seen by the witness was the flash of the match. The gasoline fumes were ignited where the hose went into the tank, and the fire was burning out of the tank up to the top of the car. The gasoline tank on the car was scorched a little bit—"you couldn't hardly see it"—where the flames had been burning.

The witness described the equipment of the station. He said the pumps were of five-gallon capacity. They are operated by suction from a motor located inside the station building. It sucks the air out and forces the gasoline up in the bowl. The distance from the pump to the building is about thirty feet. To get gasoline into the pump you press a switch which starts the motor. The gasoline is drawn from underground tanks located thirty feet or more from the pumps and back of the station building. The tanks are filled daily by trucks which do not come past the same places that automobiles do, but follow a different route and back into the place, back further. There is no gasoline dripping from the hose and the connections are all tight. The witness said the pumps were gone over now and then for defects, but could not say when, if ever, they were inspected. The hose from the pump used in supplying

automobiles was ten feet in length and composed of rubber with cotton lining around the inside. He was unable to say whether such hose would generate static electricity.

Robert E. Stewart testified he was the electrician who installed the wiring in the pump in question. The wiring is still in the pump and it is in good working order. From his knowledge of the wiring he thought sparks could not escape so as to ignite gasoline. The switch is inside the metal parts of the pump, and about half way between the glass bowl and the base. It is built into the post, and has over it a metal plate which remains closed when the switch is thrown off or on in supplying the bowl. In working the pump a small lever is lifted up. This pushes a button inside the pump and turns the pump on or off. The switch is enclosed and under a lid that is held in place with screws and nuts. It is unnecessary to open this lid except to put in a new switch. The switch is an enclosed vapor-tight switch. The witness did not know what size spark would be caused by making and breaking the switch, though a little spark would be made, but said that if the spark were large enough and if the lid were off and if gasoline vapor should come in contact with the spark an. explosion would result.

Louis E. Maher testified that he was foreman of maintenance for defendant and had laid out the filling station in question. The pumps are operated by motors in a building thirty-three and forty-five feet therefrom, respectively. He was familiar with the mechanism on the interior of the pumps and said no vapor could get inside. The vapor-proof switch is on the outside of the pump, but enclosed in a cast-iron box. The switch is operated by a steel pin which pushes a button into the box and starts the motor. By the term "vapor-proof" the witness said he meant entirely closed. The wiring inside the pumps is in conduits, and the switch, itself, is sealed. The pump is approved by the Board of Underwriters. The witness had seen the equipment about every two weeks since it was installed and on each visit examined the hose, the measure of the pump and the working parts. He knew of nothing connected with the operation of the pump that would wear off the insulation on the electric wires. There is no vibration, since the operating motors are located some distance away in the building heretofore mentioned.

In rebuttal, Mr. Wilson, for plaintiff, testified that as keeper of a garage patronized by plaintiff he had daily seen plaintiff's car, had frequently wiped it off, and had never noticed any burn or disfigurement on it.

For the plaintiff the cause was submitted on an instruction which told the jury if they found from the evidence the facts were as alleged in the petition (stating them) "then the presumption is

that such injury was occasioned by some negligence of the defendant'' and plaintiff was entitled to recover unless defendant had proved by the greater weight of the evidence that it could not have prevented the fire by the exercise of ordinary care. Thus the doctrine *res ipsa loquitur* was plainly invoked. If that was wrong it was, of course, error, but error in favor of plaintiff, of which he cannot complain.

For the defendant, the court told the jury, by one instruction that the allegations in the plaintiff's petition as submitted for their consideration in other instructions, must be proved by plaintiff to the jurys' satisfaction by the preponderance or greater weight of the evidence, and that if the evidence did not preponderate in favor of plaintiff, or if the jury were unable to determine upon which side the preponderance of the evidence lay, then in either event they should render a verdict for the defendant. In the other instruction the court defined ordinary care and told the jury unless they found from the evidence that defendant failed to exercise such care their verdict should be for the defendant. These instructions put the burden on the plaintiff to prove the defendant's negligence. If the doctrine *res ipsa loquitur* does not apply to the case they are correct.

The plaintiff contends that since there is substantial evidence showing gasoline on the ground near and about defendant's pumps suddenly became ignited and severely burned plaintiff without fault upon his part; and evidence further showing the defendant maintained at and near the point of the accident electric lights, motors, switches and similar appliances in the operation of which sparks could be caused of sufficient size to ignite gasoline vapor; therefore a presumption arises that negligence of the defendant caused the fire and the consequent injury to the plaintiff.

The doctrine *res ipsa loquitur* has been applied by our courts of last resort to many different situations. Some of the cases thought to be representative of the trend of judicial opinion in Missouri are cited in the plaintiff's brief. We need refer only to two or three in which the facts are regarded as being more nearly analogous to those presented by the instant record. In Riecke v. Anheuser-Busch Brewing Assn., 206 Mo. App. 246, 227 S. W. 631, and Stolle v. Anheuser-Busch, 307 Mo. 520, 271 S. W. 497, 39 A. L. R. 1001, the presumption was allowed when the plaintiff was injured by the explosion of a bottled beverage; and in Fitch v. Pacific Rd. Co., 45 Mo. 322, where sparks were emitted from a locomotive smokestack and destroyed the plaintiff's fences and corn.

The plaintiff puts rather more emphasis on the following cases decided in other states: Newton v. Texas Co., 180 N. C. 561, 105 S. E. 433, where a stream of gasoline was seen flowing from de-

fendant's warehouse and under a railroad track, and shortly afterward a train passed over the spot and an explosion followed; Sistrunk v. Texas Holding Co., 88 Cal. App. 698, 264 Pac. 259, in which it appears the defendant had been negligently maintaining large oil tanks and an adjacent open pump, and that while the tanks were being heated with an open fire not far distant a fire occurred; Guilford v. Foster & Davis, 131 Okla. 148, 268 Pac. 299, where a visitor was being conducted through a gasoline plant by defendant's employee who opened the valve of a tank containing gasoline under pressure, and the gasoline immediately ignited, as it was shown to have a propensity to do under such conditions; Levin v. N. Y. C. & H. R. Railroad Co., 133 N. Y. Supp. 467, a case of negligent maintenance by defendant in its railroad yards of a large tank of highly combustible gas which under such conditions was likely to explode and did explode; and Nelson v. Zamboni, 164 Minn. 314, 20 N. W. 943.

It is upon the last case, Nelson v. Zamboni, supra, that the plaintiff places especial reliance. There two large tanks of gasoline were in the basement of defendant's filling station and were not buried as such tanks usually are. All the electrically operated pumping mechanism, including an automatic switch, was located in the basement with the unburied tanks and their pipes. There was evidence tending to show the switch was in an unsafe condition, in that the cover thereof was loose enough to permit gasoline vapor escaping from the feed pipes of the tanks to be ignited by a spark from the switch. The entire filling station in which the tanks and mechanism were stored together was destroyed by a violent explosion.

These cases all rest on their particular facts. The evidence in the Zamboni case, last mentioned, which plaintiff stresses, was far stronger than that under review here. The surrounding circumstances were inherently and in logical sequence indicative of negligence with respect to matters peculiarly within the knowledge of the defendant. We cannot say on a comparison of the facts in the cited cases with the facts in this case, that they are parallel, or that the authorities are persuasive.

An early, much quoted and universally accepted statement of the rationale of the doctrine *res ipsa loquitur* is found in Scott v. London & St. K. Docks Co., 3 Hurls. & C. 596, 601, as follows:

"But where the thing is shown to be under the management of the defendant or his servants, and the accident is such as in the ordinary course of things does not happen if those who have the management use proper care, it affords reasonable evidence, in the absence of explanation by the defendants, that the accident arose from want of care."

After quoting this language Goode, J., speaking for the St. Louis Court of Appeals, said in Trotter v. St. L. & Sub. Ry. Co., 122 Mo. App. 405, 413, 99 S. W. 508, 510: "All the opinions treating of this subject which have come under our observation insist, as the condition on which the rule will be applied, on the presence of every fact stated in the foregoing excerpt to be essential to its correct application."

In Pointer v. Mountain Ry. Const. Co., 269 Mo. 104, 121, 189 S. W. 805, 810, this court said the doctrine applies, outside of carrier and passenger cases, only, "where the injury arises from some condition or event that is in its very nature so obviously destructive of the safety of person or property and is so tortious in its quality as, in the first instance at least, to permit no inference save that of negligence on the part of the person in the control of the injurious agency."

In McGrath v. St. Louis Transit Co., 197 Mo. 97, 104, 94 S. W. 872, 874, the following is stated:

"Where all the facts connected with the accident fail to point to the negligence of the defendant as the proximate cause of the accident. but show a state of affairs where an inference could be as reasonably drawn that the accident was due to a cause or causes other than the negligent act of the defendant, then the plaintiff cannot rely upon mere proof of the surrounding facts and circumstances of the accident, and the defendant is not called upon to explain the cause of the accident, and to purge himself of the imputed or inferential negligence."

Another case, Guffey v. H. & St. J. Railroad Co., 53 Mo. App. 462, 469, says:

"It is well settled that negligence cannot be presumed when nothing is done out of the usual course of business unless the course is improper."

From the Missouri authorities just reviewed, especially the Pointer and McGrath cases, it appears all the facts connected with each particular case must be consulted and from them the court must be able to take judicial notice, as a matter of common knowledge and experience, that the accident prima-facie could not have occurred but for negligence on the part of the defendant. So, too, in master and servant cases it has been expressly declared the doctrine may be invoked only when the facts of the particular controversy warrant it. [Meade v. Mo. Water & Steam Supply Co., 318 Mo. 350, 356-7, 300 S. W. 515, 517; Russell v. St. L. & S. F. Ry. Co. (Mo. App.), 245 S. W. 590, 591.] The latter was a case where an electric light bulb exploded, and the court refused to allow the presumption.

But it has been said with reason "the application of this rule (*res ipsa loquitur*) in its primary or distinctive sense rests on common experience, and 'not at all upon circumstances of the particular case tending of their own force to show that the very accident in question was in fact the result of negligence.' " [Memphis St. Ry. Co. v. Stockton, 143 Tenn. 201, 226 S. W. 187, 22 A. L. R. 1467, 1470, note; L. R. A. 1917E, note p. 9.] The note in L. R. A. 1917E, page 10, goes on to declare the rule "may be said to rest upon the generic circumstances peculiar to the class of physical causes which produced the casualty in question." On this theory the doctrine is applied to classes of occurrences, as in carrier and passenger cases, though the evidence fails to show actual negligence in the particular case.

If an attempt were made to classify this case and to put it in a broad category, it would, probably, have to be called either a fire case or an explosion case—not overlooking the fact that the evidence for plaintiff did not show an explosion. As to fires, the general rule is the mere occurrence of a fire does not raise a presumption of negligence though "the doctrine has been held to apply where . . . the circumstances under which the fire originated and spread are such as to show that defendant or his servants were negligent in connection therewith." [45 C. J. sec. 771, p. 1204; see also 20 R. C. L. sec. 157, p. 190.] Fires set out by locomotives are an exception to the rule in some jurisdictions, as here (see Catron v. Nichols, 81 Mo. 80), but the authorities are in conflict even on that proposition.

Proof of an explosion is treated by some cases as a proper basis for a presumption of negligence. [20 R. C. L. sec. 159, p. 192.] But in 25 Corpus Juris, Section 38, page 205, it is said: "The mere fact of an explosion may raise a presumption of negligence, but the rule is not of universal application. The doctrine of *res ipsa loquitur* is not applicable where the explosive causing the accident is not under the exclusive control of the defendant."

With respect to gas explosions, after enumerating circumstances in which the presumption will be raised, absent any intervening agency disproving negligence, 28 Corpus Juris, Section 69, page 600, goes on to say: "The doctrine of *res ipsa loquitur* is, however, subject to well settled limitations, and does not apply where the injury may have been caused by escape of gas from pipes and appliances not under the control of defendant, or where there is no evidence to show the cause of the explosion." As to fires caused by the ignition of gasoline, we find nothing in the cases from other states cited by the plaintiff and referred to earlier in the opinion, which sustains the contention that mere proof of a gasoline fire on premises controlled by the defendant will raise a presumption of negligence on his part, regardless of other attending circumstances.

Let us view this case on both applications or meanings of the expression *res ipsa loquitur*—that is, first considering all the evidence in the case, and second, regarding the case as a type. We have no right to weigh the evidence, but it is within our province to determine whether it is substantial, and to point to inferences that may be drawn therefrom. And if and insofar as it is our duty to take judicial notice of ultimate facts or conclusions to be drawn from the record, we must of course consider the evidence.

In entering the filling station with his automobile's electrical mechanism working and lights burning, the plaintiff passed over the spot where the fire later flared up. He got out and took a position on that spot. He said he was unable to testify whether there was any gasoline or other inflammable substance there, and the attendant says there was none. When the fire started it was on the ground back of the car and not on the pump or hose. All the evidence is to this effect and the fact is further inferable from the plaintiff's testimony that he jerked the hose away to prevent the fire from reaching the pump. From the facts stated and from the area covered by the fire and the fierceness with which it burned the further inference may be drawn that the blaze was ignited by some agency back of the car, and that the gasoline on the ground was scattered by the hose when plaintiff threw it aside. That was obviously a sudden, spasmodic and futile act, considering the other end of the hose was attached to the pump and that gasoline was being discharged therefrom.

The testimony of all of plaintiff's witnesses was, furthermore, that no explosion occurred. Yet on the theory he advanced, the fire on the ground back of the car resulted from the ignition of gasoline vapor by a spark several feet distant in the switch box half way up on the pump. According to the testimony for defendant there was a sudden explosive outburst of flame at the tank on the rear of the automobile, but that is accounted for by the intervention of another agency, as seems necessarily true if it first occurred there.

The pump equipment was of standard type and construction and in good condition. There is not an intimation to the contrary in the evidence. The only possibility of its being a source of ignition may be gathered from the statement of the defendant's witness Stewart on cross-examination that when the switch was thrown it might make a spark big enough to cause an explosion if the lid of the switch box were off and the spark came in contact with gasoline vapor. But the witness said the switch was vapor-proof and there was no evidence that the lid was off.

Another thing to be considered is this. The switch was used to start and stop the motor which filled the bowl of the pump with

gasoline. But the bowl was not being filled at the time the fire started. The defendant's witness said he had discharged the pump once and refilled it with five gallons of gasoline which had nearly all been run into the car when the accident occurred. The plaintiff's testimony appears to agree with that version of the occurrence this far, at least—he says the filling operation had continued two to five minutes before the fire started and he called to the attendant to shut off the pump. If the pump was discharging gasoline the movement of the switch was completed and past.

On a consideration of all the evidence in the record we are unable to say there is anything indicating the defendant's business was being conducted at the time other than in the usual manner; and there is nothing to show the equipment was defective, the surroundings faulty, or that the accident otherwise was prima-facie due to the defendant's negligence. If the case is to be governed by the rules announced in the Missouri decisions heretofore reviewed, there is no basis for the application of the doctrine *res ipsa loquitur*.

If the case be viewed as of a type or class we think it falls quite as short of being a true *res ipsa loquitur* case. It cannot be said as a matter of common knowledge that fires ordinarily do not occur at gasoline-filling stations except from negligence on the part of the proprietor, especially when automobiles are being charged with gasoline. Indeed it is inaccurate to say either that the proprietor has peculiar knowledge of the pertinent facts or that the instrumentalities employed are exclusively in his control, for the automobiles coming and going usually belong to others and contribute to the hazard in varying degrees. The drivers accompany them and generally are present during the operation. There are many ways in which a fire may be ignited without negligence on the part of the proprietor.

We do not forget that a defendant is sometimes held bound by the *res ipsa loquitur* doctrine though not in control of all the instrumentalities involved in a casualty—as in case of a collision between a vehicle operated by a carrier and another vehicle operated by someone else. But there is a conflict in the authorities from other states on that question. (Gibson v. Wells (Mo. App.), 258 S. W. 1; 25 A. L. R. 690, note); and it at least can be said in such instances the injured passenger was not in control of either vehicle, and that ordinarily, perhaps, the accident would not have occurred if the carrier had used due caution, even though the driver of the other vehicle also was to blame. We are not passing on that question, but think there is a distinction.

In our opinion the judgment below was correct and it is accordingly affirmed. *Lindsay* and *Seddon, CC.*, concur.

PER CURIAM:—The foregoing opinion by ELLISON, C., is adopted as the opinion of the court. All of the judges concur.