**GATEWAY CHEMICAL COMPANY, Inc.,**
Appellant,

v.

**R. Dinwiddie GROVES et al., Respondents.**

No. 49551.

Supreme Court of Missouri,

Division No. 2.

Sept. 9, 1963.

Gordon, Sanders, Adams & Niewald, Lewis W. Sanders, McKenzie, Williams, Merrick, Beamer & Stubbs, Jack G. Beamer, Kansas City, for appellant.

Harry P. Thomson, Jr., Norman M. Tempel, Kansas City, Shughart, Thomson & Kilroy, Kansas City, of counsel, for respondent R. Dinwiddie Groves.

Douglas Stripp, Robert B. Olsen, James F. Duncan, Kansas City, Watson, Ess, Marshall & Enggas, Kansas City, of counsel, for respondents Harvey and Sage.

BARRETT, Commissioner.

R. D. Groves and the widows of his deceased brothers own the building known as 1412–1414 Walnut Street, Kansas City. Since 1936 the Groves have leased the

building to the plaintiff, Gateway Chemical Company, a manufacturer of metal and floor polish, sweeping compound and other "maintenance supplies." In the written leases, the last five-year renewal ending on December 31, 1960, the lessors, Groves, agreed to keep and maintain the exterior of the building and "the heating plant." In August 1957, Martin's Mid-West Boiler and Welding Company made a written proposal to Groves to repair the boiler in the basement of the building. In the main the work consisted in removing part of the brickwork from around the boiler and then cutting off with an acetylene torch the old metal from the "mud leg" of the firebox and replacing it with new metal. On September 17, 1957, about 11 o'clock in the morning, and while the boiler work was in progress, there was a fire, particularly in the basement of the building, and Gateway Chemical Company sustained an alleged loss of property and business of $80,000. To recover these losses Gateway instituted this tort action against the Groves, the owners of the building, Martin's, the contractor to repair the heating system, and its boilermaker, Russell J. Sage. The trial court dismissed the action and upon appeal to this court, Gateway Chemical Company v. Groves, Mo., 338 S.W.2d 83, it was held that the allegations of the petition met the essential tests for the application of the res ipsa loquitur doctrine. In the course of its decision the court again repeated the quotation: " 'The mere occurrence of a fire does not raise a presumption of negligence.' " But, the court said, "It will be noted that the petition alleges that defendants 'were in complete control and custody of the heating plant in the said premises, and of an acetylene torch being used by defendant Sage * * * [and] as a direct result of the negligence of the defendant owners and the defendant Boiler Company * * * [and] of the defendant Sage, *in the handling and operation of said acetylene torch, a fire was started in and about the heating plant* * * *.' We think it is clear that (1) a fire is not ordinarily started by the operation of an acetylene torch if the operator in charge thereof uses due care * * * (2) the acetylene torch which is alleged to have started the fire and the area where the fire started were unequivocally alleged to have been under the complete control and custody of defendants * * * and (3) since the offending instrumentality and the area where the fire started were in the custody and under the control of the defendants at the time the fire started they possess superior knowledge or means of information as to the cause of the occurrence * * *." (Italics supplied.) Upon the trial of the cause a jury returned a verdict in favor of the defendants and now the essentially meritorious question is whether the circumstances adduced upon the trial permit the inference of negligence as alleged in starting and causing the fire.

As to the respondents Groves it stands admitted that it was their duty to maintain the heating plant and that pursuant to that obligation they engaged Martin's to make certain repairs on the boiler. It also stands admitted that during the time the repairs were being made there was a fire, for the most part in the basement, but one of the sharply contested issues was just where the fire was first seen, and presumably originated. The plaintiff claimed that the "principal part of the fire" was in the northwest corner of the basement in the vicinity of the boiler, as the plaintiff's principal witness, the plant foreman, said, in the joists "coming up from the landing underneath the floor, the first floor. * * * the fire licked up from under the first floor joists from the north. * * * It was coming up from under the floor; the ceiling of the basement or the floor joists of the first floor, and it was coming directly from under the floor, just going across and up." Positively and emphatically, he said, "There was no fire anywhere near the steps because the fire was up to the ceiling of the basement rather than to the base of the steps. It was coming up under from the ceiling of the basement, or under the floor of the first floor." According to him, the firemen

went down the steps and turned the hose on the floor where the flames were coming up, at that time, he said, there was no fire on the steps. But the first knowledge this witness had of the fact of the fire was when Sage came running up the steps to the first floor and said "I like to got trapped. * * * The place is on fire."

The defendants claimed that the fire was first seen and originated underneath the stairway, a portion of the building under the control of the plaintiff. Sage said that underneath the stairway there were stored a lot of paint cans, clothing, rags, paint brushes, mops and brooms. He said that the boiler work had progressed to the point that he was inside the firebox using his cutting torch and a pressed board as a shield against the "dingle berries." He was cutting the metal on the south side of the firebox and went outside to get a scraping tool, there was then no fire. He returned and had been working about five minutes when he felt the draft through the firebox change from cool to hot, and, he said, "I put my torch out, turned my torch out, climbed out of the firebox, went out of the boiler room, went out of the boiler room door, then I could see the fire." Sage said that there was no fire to his left or to his right, but, he said, "There was fire under the stairs and behind the stairs in a—I guess it was an elevator shaft." Later, he observed, "This stairwell had created a draft and this area right in here (indicating) was just an inferno of fire, shooting up these stairs. It was hitting this landing here, coming plumb around, which is a ceiling of the first floor, coming plumb around the side, out here and then this was coming through between the steps and sweeping upwards." Sage said that underneath the stairs he could see the open paint cans and paint brushes burning. The first person he encountered on the first floor was a secretary, and next the plant foreman, Reeves, and "I says, 'The basement is on fire,' and I think I says—I told him then that I had been trapped and almost got my a-s-s burned off."

Thus plainly it was established that there was a fire and it may be assumed that the plaintiff's evidence reasonably establishes that the fire originated in the area of the heating plant. But, "As to fires, the general rule is the mere occurrence of a fire does not raise a presumption of negligence though 'the doctrine (res ipsa loquitur) has been held to apply where * * * the circumstances under which the fire originated and spread are such as to show that defendant or his servants were negligent in connection therewith.'" Kapros v. Pierce Oil Corporation, 324 Mo. 992, 1002, 25 S.W.2d 777, 781, 78 A.L.R. 722. And as to an acetylene torch there are these general rules: "It has frequently been held or recognized that liability may be imposed upon the user or his employer for injury or damage resulting from fire started by the use of a blowtorch, at least upon a showing of negligence on the part of such user or his employer, but there is no liability in the absence of negligence. * * * However, the user of a blowtorch or his employer is not liable for injury or damage caused by fire, in the absence of sufficient proof of causal connection between the use of the torch and the fire. * * * However, the use of a blowtorch prior to a fire does not result in liability for injury or damage caused by the fire, in the absence of negligence on the part of the user of the torch." Annotation 49 A.L.R.2d 368, 371, 374. These principles, including in appropriate circumstances the applicability of the res ipsa loquitur doctrine, were all tacitly recognized when the case was here before and the problem was whether the petition stated a cause of action. Gateway Chemical Company v. Groves, supra. And while the facts prerequisite to a res ipsa loquitur submission may be established circumstantially, as the court said of a capsized boat, "it is incumbent upon the plaintiff seeking to invoke it (res ipsa loquitur) to show by *facts and attendant circumstances the existence of the conditions essential to the application of the doctrine.*" Charlton v. Lovelace,

351 Mo. 364, 370, 173 S.W.2d 13, 16. And here the problem is whether from the attendant circumstances a jury could reasonably find the essence of the plaintiff's hypothesis that "defendant Sage was operating said acetylene cutting torch in cutting the south inside wall of the boiler or heating plant referred in the evidence *in such a manner as to directly cause a fire in the basement of the building* at 1412–14 Walnut Street, then you are instructed that such facts, if you believe them to be true, are sufficient circumstantial evidence to warrant a finding by you that defendant Sage was negligent * * *."

Just prior to the discovery of the fire, Sage, admittedly, was using the acetylene torch in the firebox. He was not employing a welder's shield against the sparks, he was using a pressed board and the metal of the firebox which he said was sufficient. But there is no fact or circumstance from which it was even a possible inference that there was a defect in the torch or its attachments or that Sage, as in Automobile Insurance Co. of Hartford v. J. C. Nichols Co. (Mo. App.), 309 S.W.2d 698, had gone to another part of the building to perform some task and in five or ten minutes "returned to the first floor and found that 'the acetylene tank was on fire and the hose of the cutting torch.'" Sage was repeatedly required to describe the manner in which he approached and went about the task of cutting and removing the metal from the mud leg but there was no question or answer suggestive of negligence in the use or operation of the torch. According to him, when he felt the warm draft, he turned the torch off and thereafter saw the fire beneath the stairway to the first floor. In short, other than the mere fact of the fire, there is no attendant circumstance from which negligence in connection with the acetylene torch or its use is a permissible inference hence permitting or invoking res ipsa loquitur (Triple A Machine Shop v. Waterman Steamship Corp., 9 Cir., 221 F.2d 916; Rockwood & Co. v. American President Lines, D.C., 68 F.Supp. 224; Fry v. Jordan Auto Co., 224

Miss. 445, 80 So.2d 53) unless it is to be found in the testimony of plaintiff's witness Davis.

At one time or another Davis, an itinerant boilermaker, had been employed by Martin's—it was denied that he was employed during the calendar year 1958. Davis, however, said that he was employed by Martin's "off and on from 1953 until 1959." He did not remember the month or the day but he said that one morning in 1958 Sage said, "Well, this is the day" meaning or referring to the day on which he was going to a lawyer's office—presumably to give a deposition. Davis testified, "And I said, 'Well, what day?' and he said, 'Well, didn't you know that I burned half of Kansas City down?' * * * And I said, 'No, I didn't,' and I said, 'I just come back into town' and he says, 'Well, you remember the Gateway Chemical Company?' * * * So he says, 'I had a bottom there,' and then I said, 'Well, what happened?' He said, 'Well I went down there. There was a hole in the wall, and I cut this sheet, outside sheet, and then I go around and I start cutting on the inside, and after a while this heat hit my shoulder, and I crawled out of the firebox and I run outside and,' he says, 'there was fire everywhere.'" As to a shield and its use there were these questions and answers: "Q. * * * in your conversation with Mr. Sage was the subject of a shield mentioned? A. Yes, there was, but he said his lawyer would find one. * * * The Court: Said 'his lawyer would find one?' Isn't that what you said? A. Yes, sir. Q. * * * Was that the extent of the conversation on the shield? A. And then he said—he laughed and he said, 'Hah! What shield?'"

■■ In considering the evidence permitting the applicability of res ipsa loquitur this court has "no right to weigh the evidence, but it is within our province to determine whether it is substantial, and to point to inferences that may be drawn therefrom." Ultimately the problem, quot-

ing from the same case, is whether "there is anything indicating the defendant's business was being conducted at the time other than in the usual manner; and there is nothing to show the equipment was defective, the surroundings faulty, or that the accident otherwise was prima facie due to the defendant's negligence." Kapros v. Pierce Oil Corporation, 324 Mo. 1. c. 1003, 1004, 25 S.W.2d 1. c. 781, 782. Davis' testimony, the substance of which has been quoted, may be subject to more than one interpretation, serious or facetious, but it is not necessary here to carefully analyze his evidence and indicate the permissible inferences. Quotations from Hendricks v. Weaver (Mo.), 183 S.W.2d 74, are so compellingly apposite to the circumstances of this case as to demonstrate that Davis' evidence is not of the probative force necessary, considered with all the other circumstances, to invoke application of the res ipsa loquitur doctrine and ultimately permit the finding of negligence. In that case it was claimed for a tenant or her deceased guest that res ipsa loquitur was applicable to an exploding fuel tank and heater and a child's resulting death. In holding that the evidence was insufficient "to make out a prima facie case for plaintiffs under the res ipsa loquitur doctrine" the court said, 183 S.W.2d 1. c. 76–77:

> "While there is evidence that the fire was first discovered in the vicinity of the front stairway, there is no evidence that it started in the private office where the stove was located; *nor is there any evidence from which an inference can be drawn that the fire started from the stove or from oil.* * * * Absent evidence that the oil stove and fuel tank exploded, causing the fire, the mere fact that the fire originated in that portion of the building in the possession and control of the defendants was wholly insufficient to support an inference that the fire was due to the negligence of the defendants.

\* \* \* There is no evidence that defendants' business, at the time of and prior to the fire, was not being conducted in the usual and ordinary manner. There is no contention that the evidence shows any defective equipment, faulty surroundings, or other circumstances sufficient to make out a prima facie case that the fire was due to defendants' negligence. \* \* \*

> "Appellants rest their case squarely on the proposition that 'an explosion and fire was caused by said heater.' Even if it be assumed that the oil stove was in operation immediately preceding the fire, *there is no evidence from which an inference may be drawn that the fire which caused the injury and death of plaintiffs' daughter originated from the fire in the stove or that the fire, which damaged the building and caused the injury and death complained of, 'was caused by said heater.'* "

In short, Davis' testimony and all the circumstances considered, it may only be said that this record leaves the inference of negligence in starting the fire to surmise and conjecture. "Whether a case be one depending upon res ipsa loquitur or upon a charge of specific negligence, it is equally true that no case is made where the existence of negligence is left wholly to conjecture, \* \* \*." Brown v. St. Louis County Gas Co. (Mo.App.), 131 S.W.2d 354, 360.

In these circumstances judgment was appropriately entered for the defendants and is, therefore, affirmed.

BOHLING and STOCKARD, CC., concur.

PER CURIAM.

The foregoing opinion by BARRETT, C., is adopted as the opinion of the court.

All of the Judges concur.