LEONA ORR, Administratrix, Appellee, v. DES MOINES ELECTRIC
LIGHT COMPANY et al., Appellants.
No. 38970.

DECEMBER 14, 1928.

REHEARING DENIED MARCH 15, 1929.

*Bradshaw, Schenk & Fowler* and *Bechly, McNeil & Scovel*, for appellants.

*C. F. Dickson* and *T. J. Bray*, for appellee.

ALBERT, J.—I. The deceased, Clarence Orr, was a plumber by occupation, and at the time in question, was engaged in in-

stalling some plumbing in the residence of one Harold Bone, in the town of Montezuma. Only a portion of the basement under the Bone residence was excavated, and the plumbing work which Orr was engaged in installing was on the first floor of the building and directly over the unexcavated portion of the basement. The wall between the excavated and the unexcavated portions of the basement was of stone, and there was an opening about 24 inches square, to give access to the unexcavated portion. The unexcavated portion was about 30 inches in height. As usual, there was not sufficient light in the unexcavated portion to work, and the deceased was using an extension cord, with a 50-watt lamp attached thereto, which cord was attached to an electric-light fixture in the excavated portion of the basement. This extension cord and lamp were owned and furnished by the deceased, and were of the type generally used in such work.

The electric distribution system of the defendant was carried on the ordinary line of poles and cross-arms, which line extended along and in front of the Bone residence. The line consisted of two primary wires, attached at the extreme end of the cross-arm on each pole. This primary system carried a voltage of about 2,300. The secondary system of three wires was carried by these same cross-arms, near the center thereof. There was a clearance between each of these wires of 12 inches. Two wires of the secondary system were what is known as "hot secondaries," and carried a voltage of approximately 110/120 volts. The third was known as a "neutral secondary," and carried no electricity. This secondary system was grounded by means of a wire connected between the neutral secondary and a pipe driven into the ground at a transformer. The purpose of this ground is to prevent the escape of electricity from the primary to the secondary system. At a point somewhat south of the Bone residence, and near the top of the pole, is what is designated as a "transformer." The purpose of this mechanism is to modify or reduce the electric current of the primary system to 110/120 volts, which is the usual voltage used for lighting and heating purposes. This secondary system, carrying the reduced voltage, served and supplied some 17 different customers, among which was the Bone residence. This system had been in use for several years, and no complaint of the service had ever been received from Bone or any of the other customers receiving service

through such system. This electric line in front of the Bone residence paralleled the street running north and south. One Fitsimmons owns the property adjoining that of Bone on the south. In front of the Fitsimmons residence, and hence between the Bone residence and the transformer, at the time in question there was a box elder tree, standing in the parking, which tree had branches running up toward the electric wires of defendant company, one limb extending out to the west over the wire. This limb at the place of leaving the tree was 4 or 5 inches in diameter. Several of the top branches rubbed on the wires, one branch about the size of a fork handle, rubbing the east wire; and there was a space of 6 or 8 inches on the east wire where the insulation was rubbed off. There were a number of branches among these wires. There is no evidence, however, that any of these limbs showed any evidence of having been burned or seared.

Defendant's experts in electrical appliances tested the system on the day following this accident, and the substance of their testimony is that the system was in good condition, and that it was impossible for any electricity to escape from the primary to the secondary system, thus increasing the voltage of the secondary system. There is also testimony from the employees of the defendant that, on the day in question, these employees were engaged in testing meters on this particular line, and that they tested the meter in the Bone residence between 8 and 9 o'clock that morning; that, in so testing the meter, they found that there was no excessive amount of electricity passing through the same; and that by their manner of testing, had there been such excess flow of current, they would have discovered same.

The deceased left his residence for work, on the morning in question, about 7 o'clock. He went to the Bone residence, and the last person who saw him alive was one Ross Bowers, a carpenter who was also working there. He testifies that he saw the deceased about 8 o'clock in the morning. From this time on, the record is silent, until about 10:30 or 11 o'clock in the morning, when Mr. Bone's small son called Bowers to the basement. Bowers looked into the opening in the excavated portion of the basement, and called to Orr, and, receiving no response, reached in and touched Orr's body. Crawling in, he tried to turn Orr over on his back, by taking hold of his left arm, and got an

electric shock. With the aid of others, the body was removed to the excavated portion of the basement and laid on the floor, and a doctor summoned. The doctor testified that, when he arrived, *rigor mortis* had set in in Orr's arms, his clothing was found to be wet, his color a livid dark, and his lips apparently more or less swollen; that in the region of the heart there was an area about the size of a hand that had a baked appearance, whitish, like the breast of a chicken, when thoroughly cooked; that the hands were white, and showed burns at the edge of the skin in places, and the outer edge had commenced to slough. He further testified that the burns were the same kind as those that result from intense heat. He further testified:

"These burns, I think, could be by the heat from an electric bulb that had been burning for an hour or two, smothered under Mr. Orr's body. I don't think the burns could have been caused by the voltage of only 110 volts, with just a single connection. It would require a continuous charge. I don't care to qualify as an expert."

As to the position in which deceased was found, the witness Bowers testified that the body was lying face downward on the ground; that, held tightly against the breast, in the region of the heart, was a 50-watt electric lamp, clasped with the right hand over the lamp, and with the left hand over the right; that it was necessary to unclasp the hands, in order to get it loose; that the lamp was completely smothered by the body; that the inside of the right hand was severely burned, and the left hand slightly. There was a place on the breast that looked as if it might have been burned. This was where the lamp was held against the body.

Plaintiff's expert testified that it is very improbable that a person could be electrocuted by 110 to 120 volts, under the conditions described in this testimony. He says, on cross-examination, that it is possible,—that he had heard of cases where a man was killed by 110 volts; and closed by saying that, in his opinion, it was possible for a voltage of 110 to cause death.

With reference to the limb of the tree, a witness testified:

"If a primary and secondary wire are in contact for some time with a limb of a tree, and there is current flowing from the primary to the secondary through the limb of the tree, it would

usually evidence itself on the limb by burning the tree. If a wire is in contact with a tree for a long time, it will either result in burning off the wire or burning off the limb."

Defendant's expert testified that, in his opinion, burns of the character described as having been found on deceased's body could have been caused by the heat of a 50-watt electric lamp, when smothered under the body of the deceased and held tightly, clasped against his breast; that a lower degree of heat is required to burn flesh than to burn cloth. This witness further testified that, by actual experiment, when a 50-watt lamp was covered with a piece of cloth and then by a piece of beefsteak, it was found that the temperature exceeded 250 degrees in a very short time, and 350 degrees in three hours. He further testified that meat cooked at the boiling point, 212 Fahrenheit. To a hypothetical question stating the facts in the case, this witness gives it as his opinion that the burns on Orr's body could have been caused by the heat of the electric lamp used by Orr.

This gives a general summary of the situation in the case, without attempting to recite all of the testimony introduced.

The theory of the plaintiff was that Orr was killed by reason of negligence on the part of the defendant in permitting the secondary system of wires to become overcharged with electric current from its primary system. The theory of the defendant was that this secondary system was not overcharged, and that, therefore, it was not liable. The burden was on the plaintiff, of course, to establish that Orr's death was caused by the alleged negligence of the defendant. Plaintiff insists at this point that, by reason of the fact situation developed in this case, aided by the doctrine of *res ipsa loquitur*, she made out a case for the jury; while the defendant insists that the situation in the case does not create such a status as would bring plaintiff's case within the field which permits the application of such doctrine; hence plaintiff has not made out a case for the jury.

It is fundamental that negligence is never presumed, but must be proven as alleged. *Case v. Chicago, R. I. & P. R. Co.,* 64 Iowa 762; *Heath v. Whitebreast Coal & Min. Co.,* 65 Iowa 737; *Cahill v. Illinois Cent. R. Co.,* 148 Iowa 241; *Bennett v. Atchison, T. & S. F. R. Co.,* 191 Iowa 1333; *In re Estate of Hill,* 202 Iowa 1038.

This general rule of negligence thus stated, however, is subject to the qualification by the doctrine of *res ipsa loquitur*. This phrase, literally translated, means, "the thing speaks for itself;" (*Huggard v. Glucose Sugar Ref. Co.*, 132 Iowa 724, l. c. 736), or, " 'the affair speaks for itself;' a general way of saying that the circumstances attendant upon an accident are, of themselves, of such a character as to justify a jury in inferring negligence as the cause of that accident." 34 Cyc. 1665.

This rule is peculiar to the law of negligence. The inference or presumption raised under this doctrine becomes the substitute for specific proof of acts or omissions constituting negligence. It only permits the jury to draw a reasonable inference from circumstances which, *prima facie*, in the ordinary course of things, are generally indicative of negligence. It dispenses with the actual evidence in the first instance, or simply provides one method by which the plaintiff may prove the negligence charged against the defendant. It is only applicable, however, where, under the existing circumstances, direct evidence is absent and not readily available. 45 Corpus Juris 1206, Section 774.

Generally speaking, this rule is applicable when the thing causing the injury is shown to be under the control of the defendant and the accident is such as, in the ordinary course of business, would not have happened if reasonable care had been used. 1 Shearman & Redfield on Negligence (6th Ed.), Section 59, says:

"When a thing which causes injury is shown to be under the management of the defendant, and the accident is such as in the ordinary course of things does not happen, if those who have the management use proper care, it affords reasonable evidence, in the absence of explanation by the defendant, that the accident arose from a want of care."

The presumption under these circumstances arises from the doctrine of probabilities. The future is measured and weighed by the past, and presumptions are created from the experiences of the past. What happened in the past under the same conditions will probably happen in the future, and ordinary and probable results will be presumed to take place until the contrary is shown. *Judson v. Giant Powder Co.*, 107 Cal. 549 (40 Pac. 1020, 29 L. R. A. 718).

" * * * the doctrine is applicable only where the physical cause of the injury and the attendant circumstances indicate such an unusual occurrence that in their very nature they carry a strong inherent probability of negligence, and in the light of ordinary experience would presumably not have happened, if those who had the management or control exercised proper care. Accordingly the mere occurrence of an unusual or unexplained accident or injury, if not such as necessarily to involve negligence, does not warrant the application of the doctrine, * * * " 45 Corpus Juris 1211.

It is only where the evidence shows the acts which produced the injury that the presumption of negligence can arise under this doctrine. That is to say, until it is known what did occasion the injury, it cannot be presumed that the defendant was guilty of some negligence which produced the injury. To put it in another way, the doctrine of *res ipsa loquitur* does not raise any presumption as to what did occasion the injury; but, after the evidence has established the thing which did occasion the injury, then, under certain circumstances, this doctrine will raise a presumption of negligence.

It is evident from the foregoing that the question of whether or not this doctrine should be applied in any given case depends wholly on the fact situation; hence no ironclad rule can be laid down as to when said doctrine shall be applied.

In this case, the deceased was found dead under the circumstances heretofore related. The doctrine of *res ipsa loquitur* is not available to the plaintiff on the question of what caused his death. If the evidence *prima facie* showed the death of plaintiff's decedent, and the circumstances were such that, in the ordinary experience of mankind, the death would not ordinarily have followed from any other cause than the negligence of the defendant, then the law will presume this negligence, which may be substituted by the plaintiff to aid her in making a prima-facie case for the jury. The fact that Orr is dead is settled. That he died from coming in contact with an electrical appliance is a fact which might have been found by the jury from the circumstantial evidence introduced in the case. These two facts being established, and it being alleged by the defendant that 110 volts are not dangerous to human life, under the doctrine of *res ipsa loquitur*, plaintiff apparently made a prima-

facie showing to carry this case to the jury. See *Duncan v. Fort Dodge Gas & Elec. Co.*, 193 Iowa 1127; *Welsch v. Frusch L. & P. Co.*, 197 Iowa 1012.

But at this point in the case, we are met with a more serious contention.

II. It is insisted that the plaintiff was not entitled to avail herself of the doctrine of *res ipsa loquitur* because of the condition of her pleadings.

In the case of *Whitmore v. Herrick*, 205 Iowa 621, this question was discussed. We there held that, if specific negligence is set forth in a given count, there is no place for general assertions, citing *Kelly v. Muscatine, B. & S. R. Co.*, 195 Iowa 17. In the *Whitmore* case it is said:

"And, as hereafter seen, it is the latter only that make applicable '*res ipsa loquitur.*'"

Later in the same case it is said:

"Throughout the country, the courts, almost without an exception, permit the '*res ipsa loquitur*' rule to apply under general, as distinguished from special, 'allegations of negligence.' Demurrer will not lie in such instance, and a motion for more specific statement could not be successful, if the 'general allegation' is properly connected with the facts adaptable to '*res ipsa loquitur.*'"

The *Kelly* case lays down the well-known rule:

"It was not necessary for the plaintiff to allege in his petition specific acts of negligence; but, having done so, he cannot depart from the issues thus tendered, and a court is warranted in submitting only those grounds which find support in the evidence."

The general rule is laid down on this proposition in 45 Corpus Juris 1225, as follows:

" * * * the authorities are practically uniform, at least in those jurisdictions where general allegations of negligence are deemed sufficient, that, where the allegation of negligence is general only, and is unaccompanied by specific averments which go to the breach of the duty relied on, plaintiff is entitled to invoke the presumption of negligence arising under the rule of *res ipsa loquitur.*"

Many decisions of the various courts in the United States are cited, sustaining this proposition. It is there further said:

" * * * there is considerable conflict in the authorities * * * it is held in some jurisdictions that, where plaintiff, instead of relying upon a general allegation of negligence, sets out specifically the negligent acts or omissions complained of, the doctrine of *res ipsa loquitur* cannot be applied, even though the case was a proper one for the application of the doctrine under a general allegation of negligence only. So where specific averments are construed to supersede or limit general allegations, and the doctrine of *res ipsa loquitur* is inapplicable under specific allegations of negligence, a plaintiff who alleges negligence generally, and also avers specific acts which go to the breach of duty relied on, cannot, of course, invoke the doctrine, even though the presumption could have been availed of under the general allegations * * * ."

When we turn to the petition of the plaintiff, it is to be noted that no general allegations of negligence are set out therein. The specific allegations of the petition are:

"That defendant negligently permitted the transformers, poles, wires, and insulation on the wires to become defective, and the insulation on said wires to become worn and defective, so that, on June 11, 1926, a high and dangerous current of electricity was conducted from the wires of said company which carried a high and dangerous current, to the wires which should have supplied the home of said Harold Bone with electric current of such strength as was necessary for lighting only."

This court is committed to the distinction between general allegations of negligence and allegations of specific negligence. In *Kelly v. Muscatine, B. & S. R. Co.*, 195 Iowa 17, l. c. 21, we said:

"It was not necessary for the plaintiff to allege in his petition specific acts of negligence; but, having done so, he cannot depart from the issues thus tendered, and a court is warranted in submitting only those grounds which find support in the evidence,"—citing *Carter v. Kansas City, St. J. & C. B. R. Co.*, 65 Iowa 287; *Miller v. Chicago & N. W. R. Co.*, 66 Iowa 364; *Babcock v. Chicago & N. W. R. Co.*, 72 Iowa 197; *Stone v.*

*Chicago, R. I. & P. R. Co.*, 149 Iowa 240; *Miller v. Chicago, M. & St. P. R. Co.*, 76 Iowa 318; *Hanley v. Ft. Dodge L. & P. Co.*, 133 Iowa 326.

See, also, *Hanen v. Lenander*, 178 Iowa 569, l. c. 575.

That general allegations of negligence are sufficient was held in *Gordon v. Chicago, R. I. & P. R. Co.*, 129 Iowa 747, l. c. 752, where we said:

"Statement of the specific acts or facts constituting the alleged negligence by which injury has been occasioned is never necessary to the statement of a cause of action,"—citing *Grinde v. M. & St. P. R. Co.*, 42 Iowa 376; *Scott v. Hogan*, 72 Iowa 614; 14 Encyc. of Pleading & Practice 333.

To the same effect are *Griffin v. City of Marion*, 163 Iowa 435, and *Dorr Cattle Co. v. Chicago G. W. R. Co.*, 128 Iowa 359.

It is apparent, therefore, that plaintiff specified her negligence, and cannot be aided in the case by the doctrine of *res ipsa loquitur* to fasten a charge of negligence on the defendant. Without the aid of this doctrine, plaintiff did not make out a case.—*Reversed*.

STEVENS, C. J., and FAVILLE, DE GRAFF, and KINDIG, JJ., concur.

EVANS and MORLING, JJ., dissent on second division.

WAGNER, J., takes no part.

EVANS, J. (dissenting).—I disagree with Division II. I think that *specific* negligence is not alleged. That is to say, the allegations of negligence are *general*, rather than specific.