C. R. PLATTER, Appellant, v. CITY OF DES MOINES, Appellee.

No. 46806.

March 5, 1946.

Raymond E. Hanke, of Des Moines, for appellant.

Fred Van Liew, City Solicitor, and Harvey Bogenrief, Assistant City Solicitor, for appellee.

SMITH, J.— On May 24, 1944, plaintiff and his family lived on approximately one hundred acres of rented farm land located between the railroad tracks to the north and the Raccoon River to the south in the city of Des Moines. His residence address was 1304 Market Street. He had lived there about six years. For convenience we will refer to the prem-

ises as if they were his. The land there lies in a bend of the river, which comes from the west and at about the Eighteenth Street bridge west of plaintiff's premises makes a wide sweep south and then east. Plaintiff's buildings and about seventy or seventy-five acres of his land were inside of what is called the levee built within the river bend. This levee is distant sixty or eighty rods from the buildings at the nearest point. It begins near the Eighteenth Street bridge, thence extends southerly, then curves southeasterly, finally turning north and running to the railroad tracks at a point some distance east of plaintiff's premises.

His buildings consisted of a house, barn, chicken house, brooder house, corncribs, milkhouse, and cave. He had some dairy cattle, milked eight cows, and had fifteen or sixteen head of young stuff. He also had about forty hogs and an undisclosed number of chickens.

A sewer line extended from the west, easterly along the south side of the railroad tracks north of plaintiff's premises, and on May 24, 1944, this sewer broke at a point about forty rods north and slightly west of plaintiff's buildings. The land within the enclosure of the levee is not flat but varies in elevation as much as twenty feet, being lower in some places than around plaintiff's buildings.

From the break in the sewer line water shot up ten or twelve feet high. The lower places filled first. For a week or ten days the land was flooded and the water got deep enough to surround plaintiff's house and be under the floor; it filled his cave and ran into the chicken house about six inches deep. He had to raise the brooder house and take his young chickens to his brother-in-law's place and put the old hens up in the haymow. He took some of his hogs to Camp Dodge and turned them on pasture and the sows with pigs he put "over on the dump in hog houses" on higher ground. He moved his milk cows to his brother-in-law's and put his stock cattle on pasture at Camp Dodge. His brother-in-law lived three miles west of Johnston Station—the record does not show how far from plaintiff's home. They had to pull his stuff out with a tractor and pulley. The water reached its highest peak when about three feet deep over Market Street.

About when the water was coming up around the house plaintiff went to the city hall to complain but received little attention. The record does not clearly show with whom he talked. The water went down something like ten days after it had first broken out. Plaintiff and his witnesses could then see the place where the water came out of the sewer. One says it rose about six or seven days and then started to go down and must have taken seven or eight days to go down.

At that point there was a manhole casing built up from the sewer and projecting several feet above ground with a manhole cover on top. The break was in the side of this casing at about the ground level. The wall of the casing at that point appeared to be about eight inches thick. One witness estimates it as a foot thick. It was made of brick and mortar—"some sand, lime, a little cement, water, mixed up to harden between the brick." One witness says it was "good material" and explained that mortar with a little cement will hold better than with all cement, or with all mortar and no cement.

The hole in the casing where the water came out was from eight inches to a foot square. The lower edge was slightly below and the upper edge above the level of the ground. The hole was not round and the edges smooth, but looked as if bricks were shoved out. The manhole cover was still on top but plaintiff did not know whether fastened down or not. The hole in the side was approximately one and a half or two feet below the cover. Plaintiff says at the place where the chunk was broken out "the construction looked pretty good."

When plaintiff looked down into the hole there was not any water either going into it from the outside or coming out from the inside. From the hole down to the top of the water in the sewer line, as plaintiff looked into it, appeared to be about six feet. This hole was the only break in the sewer any of the witnesses could observe.

About the middle of June (one witness says "around the 9th") the water started coming out again and flooded the lands about the same place as before, all the water coming out of this same hole. Before the first flood came plaintiff had planted about fifteen acres in corn and he had alfalfa and brome grass

planted in about three acres in the hog lot. After the first waters went down part of this ground was prepared again. Plaintiff had just disked ten acres a couple of times and gotten it ready to plant when the water came up a second time. After the second flood subsided it was the first part of July. Plaintiff then planted seven or eight acres of sweet corn and a little sorgo corn for seed. All he finally realized from these efforts was about two acres of unmatured sorgo that made feed but no crop and no pasture. He later brought the hogs and chickens back, but not the cattle: "There wasn't anything there for them to eat."

Plaintiff and his witnesses describe the sediment that was spread around by the flood as looking like "raw sewage," with offensive, rotten odors that continued for a month "or better" after the last of the water went down. The City Health Department condemned the wells and posted signs. "We got city water put in there along in the fall."

The foregoing is a summary of the testimony of plaintiff and his witnesses. Further details will be referred to as we discuss the propositions of law involved.

Appellant in argument bases his claimed right of action upon three propositions: 1. Appellee city was negligent in failing to maintain the sewer so as to avoid breaking by pressure from within. 2. After the sewer line broke and appellee city had notice thereof the city was negligent in failing to repair same promptly so as to protect against the subsequent flood. 3. The result of the floods constituted a nuisance, causing damage for which the city was liable.

The city relies for affirmance upon these several propositions: 1. Appellant failed to show any negligence in construction or maintenance; failed to show the existence of a nuisance; or any act or omission of the city constituting a proximate cause of the sewer's breaking. 2. Appellant failed to show there was reasonable opportunity to repair the sewer break between the two floods. 3. Appellant's proof of damages was wholly conjectural and uncertain.

The trial court, at the close of appellant's evidence, found: That appellant's evidence failed to show any negligent act or omission to act which could be the proximate cause of the

break in the sewer or of the resulting nuisance; that the break was caused by pressure from within, due to unusual, heavy rainfall just prior to the first flood; that it was impossible under the evidence to separate the damage caused by the second flood from that caused by the first; that it is doubtful if the city had sufficient time to repair the break before the coming of the second flood; that there was a failure of proof as to the proper measure of damages and to submit the case would leave the question of damages to conjecture and uncertainty; and that there was a failure to show any damages proximately resulting from any wrongful act of the city. Verdict was directed against appellant at the close of his evidence.

I. We find in the record no evidence that the break in the sewer on May 24th was due to any negligence of appellee city. The doctrine of res ipsa loquitur is not invoked by appellant. Negligence cannot be presumed but must be proven. The trial court found the "first flood" was "caused from pressure from within, due to the unusual and unexpected heavy rainfall * * *."

Appellant argues the possibility that there may have been an obstruction farther down in the sewer that caused the water and sewage to back up and force its way out at this particular point. But if we were to assume the correctness of this conjecture there would still be an absence of any showing that the break was due to any negligence of the city.

In fact the cause of the break is unexplained under the record. We do not know what caused the pressure from within. We do not know whether the manhole cover was fastened or remained in place of its own weight. There is no showing as to what became of the bricks from the hole or whether they were forced out when the water "shot up." The only evidence as to the construction of the manhole casing where the break occurred indicates affirmatively that it was proper. Why the break occurred at the particular place or why it occurred at all can only be conjectured.

The city was not an insurer and can be held liable only for negligence in the performance of its duty. Hemminger v. City of Des Moines, 199 Iowa 1302, 1303, 1304, 203 N. W. 822;

43 C. J., Municipal Corporations, section 1888. We are compelled to conclude that so far as concerns the damage caused by the first flood following the break there is not sufficient evidence to make a case for the jury.

II. But appellant urges that the city failed to exercise due diligence in repairing the break promptly after the first flood subsided and before the second one came. We think there was sufficient evidence to make this a jury question. It is true the testimony is not entirely clear as to the date of the second inundation or when the effects of the first one disappeared sufficiently to permit repair of the break.

The first flood was May 24th. Appellant testifies the second came "about the middle of June." He also testifies that he had in the meantime "disked ten acres a couple of times and gotten it ready to plant when the water came up a second time."

There is evidence that witnesses had been able to get to the manhole and inspect the break and several describe it in some detail. One says from seven to ten days elapsed "between the time when the water got down so that it didn't enter through this break * * * until the water started coming out again." This witness explained how, in his opinion, the repair might have been effected. The testimony of other witnesses tends to show that there was a period of time between floods when the manhole was readily accessible and might have been repaired.

We hold that it was a jury question whether the city was guilty of negligence in failing to act for the protection of appellant from injury from the second flood.

III. The city contends, and the trial court found, there was a failure of proof as to the proper measure of recovery to be submitted to the jury. If it were a case in which the city might be found liable on account of both floods, the appellant might conceivably avail himself of the rule that where "the cause [of the injury] was reasonably certain, the mere difficulty in ascertaining or measuring the damage will not justify the denial of the recovery thereof." See Swift & Co. v. Redhead, 147 Iowa 94, 104, 122 N. W. 140, 143. See, also,

City of Corning v. Iowa-Nebraska L. & P. Co., 225 Iowa 1380, 1390, 282 N. W. 791; 25 C. J. S., Damages, section 28.

A more difficult question, however, arises when the court is confronted, as here, with a case in which there is evidence of damages from various causes, as to a portion of which defendant cannot be held responsible. It has been many times held that if there is no evidence to enable the jury to form a reasonable estimate as to the portion of damage resulting from the separate causes, it cannot arbitrarily apportion a part of the damages to the acts for which defendant is responsible. 25 C. J. S., Damages, section 28; Tesdell v. Des Moines City Ry. Co., 197 Iowa 563, 565, 197 N. W. 629; Wappenstein v. Schrepel, 1943, 19 Wash. 2d 371, 142 P. 2d 897, 899; Landeen v. DeJung, 1945, 219 Minn. 287, 17 N. W. 2d 648, 652; Lusk v. Onstott, 1944, Tex. Civ. App., 178 S. W. 2d 549, 551; Parker v. Pettit, 1943, 171 Or. 481, 138 P. 2d 592, 596; Panhandle & S. F. Ry. Co. v. Wiggins, Tex. Civ. App., 161 S. W. 2d 501; Kershaw Mining Co. v. Lankford, 213 Ala. 630, 105 So. 896. Earlier cases are cited in support of the same text in 17 C. J. 758, 759, note 82.

■ This situation confronts appellant here as to the property damage claimed. Of course, reasonable certainty only is required. "The law is generous in the license that it accords to the triers of the facts when seeking to segregate the damages." Burt Olney Canning Co. v. State, 230 N. Y. 351, 356, 130 N. E. 574, 576. But under this record we have, in addition to the uncertainty of the evidence as to the total damage caused by both floods, the further uncertainty of apportionment of damage between the two floods. No reasonable yardstick is given by which the jury might make this apportionment. We are compelled to agree with the finding of the trial court, so far as property damage is concerned, that there was not sufficient evidence to go to the jury. Of course, upon another trial additional evidence may be offered. Therefore, we deem it unnecessary to discuss further appellant's right to recover damage to his property.

■ But in addition to the damage to property heretofore discussed there is also alleged, and evidence offered to prove, substantial injury to appellant by reason of the "foul, obnox-

ious. odors'' caused by the deposit of sewage in the vicinity of appellant's home. Damages from such injury are not susceptible of exact measurement. The rule above announced does not apply to them. There is sufficient showing in the record from which the jury, if it were to find the city negligent under Division II of this opinion, might appraise the total damage suffered by appellant by reason of noxious and offensive odors and determine what part of same was fairly and reasonably attributable to the second flood. Certainly proof of ''inconvenience and discomfort suffered by plaintiff and his family by reason of noxious odors,'' if caused by the city's lack of diligence, is a sufficient basis for the allowance of damages. See Duncanson v. City of Fort Dodge, 233 Iowa 1325, 1328 et seq., 11 N. W. 2d 583, 585, and cases therein cited and reviewed.

. : It follows that the decision of the trial court must be reversed.—Reversed.

BLISS, C. J., and HALE, MANTZ, GARFIELD, OLIVER, MILLER, and MULRONEY, JJ., concur.