Barney Eaves et al., Appellees, v. City of Ottumwa, Appellant.

No. 47264.

(Reported in 38 N. W. 2d 761)

August 5, 1949.

Charles Bookin and Gilmore & Dull, all of Ottumwa, for appellant.

Swartz & Swartz and McNett, Kuhns & McNett, all of Ottumwa, for appellees.

GARFIELD, J.—Plaintiffs' petition in twenty-eight counts seeks damages resulting from a flood on May 23, 1944, to twenty-eight properties in defendant-city. At least most of the damaged properties are residences and contents thereof in an area adjacent to a diversion channel or race used by the city in the operation of its hydroelectric plant. Each count in turn consists of two divisions. The first division charges specific negligence of the city and the second is based on the doctrine of res ipsa loquitur.

Count 23 for damage to the Yeoman property was first tried under an arrangement whereby a verdict for plaintiff Yeoman would control as to the remaining counts except upon the issues of injury and amount of damage to the other properties. There was a verdict and judgment for Yeoman of $980 from which this appeal is taken.

The general course of the Des Moines River through Ottumwa is from northwest to southeast. At Turkey Island the river curves to the south and then makes a U turn to the northeast. On each side of Turkey Island is a dam 330 feet long. The diversion channel or race above mentioned extends southeast for about three fourths of a mile from an opening in the river near the east side of Turkey Island to the end of the U turn. Defendant's hydroelectric plant is at the lower end of the channel where it maintains four Tainter gates or floodgates in the channel which is 200 feet wide. Each gate is 25 feet long, 17 feet high, and can be raised 7 feet 7½ inches from the bed of the channel.

The flooded area is immediately northeast of the race, between it and the Burlington railroad tracks which parallel the race, and between Blackhawk Street on the northwest and Cass

Street on the southeast. Along each side of the race is a levee. Tracks of the Milwaukee railroad are built on the northeast levee. The bridge across the race just below Blackhawk Street belongs to the Milwaukee. The accompanying plat may help visualize the physical layout.

About 7:30 a.m. on Tuesday, May 23, 1944, water began to overflow the northeast levee of the race about 75 feet northwest of Benton Street (the second street below Blackhawk) into the area in question. This overflow from the race continued during the day until the water in this area averaged about three feet deep. Mr. Brown, superintendent of the waterworks, and other employees of defendant were fully aware of what was happening.

About 8:30 a.m., a proprietor of a business establishment in the flooded area asked Mr. Brown about opening the floodgates above referred to. Mr. Brown replied it might endanger the Milwaukee's bridge to do so. There was a similar conversation between a resident of the area and Mr. Brown about 10:45 a.m. The gates remained closed until about 8:30 that evening when they were opened.

I. Defendant contends there is insufficient evidence the damage complained of was caused by the negligence charged in division 1 of the various counts. The only specific charge of negligence submitted to the jury was defendant's failure to open the floodgates, thus blocking the flow of water through the race. We think the evidence, in the light most favorable to plaintiffs, sufficient to warrant submitting to the jury the claim based on this charge of negligence.

Incidentally we may observe this contention of defendant seems somewhat inconsistent with its contention both in the trial court and here that plaintiffs were not entitled to rely on the doctrine of res ipsa loquitur because they had introduced evidence of specific negligence.

The floodgates were opened upon the recommendation of Colonel Peel, an army engineer from Rock Island who had come to Ottumwa at Superintendent Brown's request because of the flood. Opening the gates permitted about 8.4 per cent more water to go through the race in a given time. There is substantial evidence that soon after the gates were opened at 8:30 p.m. the flow of water over the northeast levee diminished, by eleven p.m. or before entirely stopped, and no water thereafter overflowed that levee. The only water in the flooded area was overflow from the race. The jury could properly conclude that raising the gates diminished and soon stopped the overflow into this area

and that the delay of twelve hours in opening the gates was the proximate cause of the flooding.

The stage of the river at Ottumwa at seven a.m. on May 23, about when the overflow from the race started, was 13.3 feet. This reading increased until a peak of 17.7 feet was reached at seven p.m. on May 24. The only other flood of this area was in 1903 when the river stage at Ottumwa was at least 20.7 feet. But there is substantial evidence that in 1903 the floodwater came direct from the river over Blackhawk Street and not as here from the race.

Nine times between the 1903 flood and the trial in March, 1946, the river stage exceeded 13.3 feet. On one of these occasions, when the river stage reached 14.24, Superintendent Brown assured residents of this area they would not be flooded because the height of the water in the race could be regulated by manipulating the floodgates and this was done. On another of these occasions, when the river stage was 13.5, witnesses testify water in the race was not within four feet from the top of the northeast levee. It may be inferred this condition was the result of opening the gates.

At 1:15 a.m. on Wednesday, May 24, defendant made an opening 60 feet wide and 15 to 18 feet deep in the southwest levee along the race at the curve about midway between the lower end of the flooded area and the end of Tisdale Street, immediately north of Cass Street. Defendant argues this opening in the southwest levee rather than the raising of the floodgates brought relief to the flooded area.

It is doubtless true this "blowing" of the southwest levee materially accelerated flowage through the race after the gates were opened, helped prevent more overflow along the northeast levee and minimized further damage. But the jury could find the damage was done by the time the gates were opened. The evidence concerning the blowing of the southwest levee does not conclusively demonstrate that failure to open the gates until the flood had progressed thirteen hours was not the proximate cause of the damage.

In support of our holding on this branch of the case see Jefferis v. Chicago & N. W. Ry. Co., 147 Iowa 124, 124 N. W.

367; Vyse v. Chicago, B. & Q. Ry. Co., 126 Iowa 90, 101 N. W. 736; Darling v. Thompson, 108 Mich. 215, 65 N. W. 754; Kearney Canal & W. S. Co. v. Akeyson, 45 Neb. 635, 63 N. W. 921. Issues of negligence and proximate cause in cases of this kind are usually for the jury. 56 Am. Jur., Waters, section 174, page 641.

II. Defendant's requested instruction No. 13 states "that if plaintiffs' property, *in its natural condition before the construction of any dams, race or levees,* would have been overflowed by the Des Moines River in May 1944, then plaintiffs are not entitled to recover." Defendant complains of the refusal of this and similar requests and the giving of instruction No. 9.

The substance of instruction No. 9 is that the city was not required to provide protection against overflow of plaintiff's (Yeoman's) property by dikes or levees and would not be liable for failure to do so or for negligence or defective construction so long as no more water was thrown on the property than would have naturally flowed over it if no dikes or embankments had been constructed; plaintiff claims his damage resulted from defendant's negligence in the operation and not the construction of its plant, gates, etc.; it was defendant's duty to exercise reasonable care to so operate its plant, gates, etc. as to avoid overflow of plaintiff's property; if it failed to exercise such care it would be negligent; if such negligence was the proximate cause of plaintiff's damage and plaintiff was free from contributory negligence then defendant would be liable for the damages sustained by plaintiff *without regard to whether the land would or would not have overflowed had it been in its natural state.*

Defendant excepted to this instruction, particularly the clause italicized by us, on the ground that if "plaintiff's property would have been flooded had it been in its natural state" defendant would not be liable. The refusal of defendant's thirteenth request and similar ones and the giving of instruction No. 9, in connection with the instructions as a whole, was not error.

The instructions make it plain the only specific charge of negligence submitted to the jury was defendant's failure to open the gates and that both divisions 1 and 2 of the various counts of the petition are bottomed on claimed negligence only in the operation of defendant's plant. The jury was told in effect at

least twice that in order to be the proximate cause of plaintiff's damage it must be shown the overflow would not have occurred if defendant had not been negligent in the operation of its plant as claimed by plaintiff.

Further reference to the evidence is called for. The race was first constructed in 1875–76 to a width of 60 to 80 feet. The northeast levee was then in its present location but was made higher about 1884 when the Milwaukee placed its tracks there. In 1917–18 the city replaced its old water power plant with a hydroelectric plant. The two dams were rebuilt in 1917. The present plant was constructed in 1930–31. The race was widened on the southwest side in 1932 to its present width of 200 feet and the levee on that side was then built.

Defendant owed plaintiffs the duty of exercising reasonable care in the operation of its plant and if it failed in this duty and such failure was the proximate cause of the damage complained of it would be liable therefor provided of course there was no contributory negligence. Defendant could not relieve itself from liability to plaintiffs for the direct consequences of its negligent operation of the plant on the theory that if conditions had remained as they were some sixty-eight years previously the river would have overflowed plaintiffs' property. This is the effect of instruction No. 9.

The area in question has not been in its natural state since the dams, race and levees were built. It is not material in this particular case whether it would have been flooded from the river if it had remained in its natural condition. The fallacy of defendant's thirteenth request is the inclusion therein of the portion above italicized by us, "in its natural condition before the construction of any dams, race or levees." The substance of the request with these words eliminated is embodied in the instructions given to the effect plaintiff could not recover unless he established he would not have been flooded if defendant had not been negligent in the operation of its gates.

Defendant was required to exercise due care in operating its plant under the conditions as they existed in May 1944, and not prior to 1875. In determining whether defendant was negligent in failing to open the gates plaintiffs were in effect entitled

964

to whatever protection the improvements made by the city and its predecessors afforded their property.

Numerous authorities support our conclusion defendant was obligated to use reasonable care in the operation of its plant to prevent damage to neighboring property from escaping water. See Kelly v. Inhabitants of Town of Winthrop, 219 Mass. 471, 107 N. E. 414; Scott v. Longwell, 139 Mich. 12, 102 N. W. 230, 5 Ann. Cas. 679; City Water Power Co. v. City of Fergus Falls, 113 Minn. 33, 128 N. W. 817, 32 L. R. A., N. S., 59, Ann. Cas. 1912A 108; Howell v. Big Horn Basin Colonization Co., 14 Wyo. 14, 81 P. 785, 1 L. R. A., N. S., 596; 3 Farnham, Waters and Water Rights, section 982, page 2798; 56 Am. Jur., Waters, section 171; 67 C. J., Waters, section 375. Some of these authorities say in substance the care to be exercised in such cases is in proportion to the danger of injury from escape of the water.

The refusal of requested instruction No. 13 and others like it and the giving of instruction No. 9 in the respect complained of find support in Jefferis v. Chicago & N. W. Ry. Co., supra, 147 Iowa 124, 130, 131, 124 N. W. 367.

Decisions cited by defendant do not conflict with our conclusion here. We will mention most of them. In McAdams v. Chicago, R. I. & P. R. Co., 200 Iowa 732, 205 N. W. 310, and Pfannebecker v. Chicago, R. I. & P. R. Co., 208 Iowa 752, 226 N. W. 161, part of the flooding was caused by a railroad embankment or trestle and part by natural overflow from a stream. We held the railroad was not liable for the entire injury. In Platter v. City of Des Moines, 237 Iowa 348, 355, 21 N. W. 2d 787, 780, there were two separate floods for only one of which the city was responsible and there was no evidence of the damage caused by that flood. Here, as stated, all the water in the flooded area came from defendant's race and, the jury could find, as a result of the negligence charged against defendant.

King v. Chicago, B. & Q. Ry. Co., 71 Iowa 696, 29 N. W. 406, Brainard v. Chicago, R. I. & P. Ry. Co., 151 Iowa 466, 131 N. W. 649, and Hinkle v. Chicago, R. I. & P. Ry. Co., 208 Iowa 1366, 227 N. W. 419, cited by defendant, involve the right—and duty—of a railroad company to install an opening in its embankment to permit water to flow in its natural course.

■ III. Defendant's witnesses Professor Waterman and Superintendent Brown express the opinions the flooded area would have been overflowed from the Des Moines River if it had remained in its natural state and also if the hydroelectric plant, including the gates, had been removed, other conditions remaining as they were in May 1944. The witnesses say they reached these conclusions from computations largely based on maps and charts showing various distances, ground elevations and river stages. Their testimony is much too involved to be explained in detail here. Defendant contends it was entitled to a directed verdict because of this evidence.

Division II hereof disposes of this contention insofar as it is based on testimony as to flooding of the area if it had remained in its natural state. Opinions that the area would have been flooded if the gates had been removed, other conditions remaining as they were in May 1944, were entirely proper since they tend to show failure to open the gates was not the proximate cause of the flood.

However, this opinion evidence did not entitle defendant to a directed verdict. The jury was not compelled to accept these opinions as verities. Such testimony is not infallible but is subject to infirmities that characterize other evidence. The jury was fully instructed as to the weight to be given the expert opinion testimony in accordance with expressions by us in Moore v. Chicago, R. I. & P. Ry. Co., 151 Iowa 353, 359, 360, 131 N. W. 30; Thompson v. Chicago & N. W. Ry. Co., 158 Iowa 235, 139 N. W. 557; Fowle v. Parsons, 160 Iowa 454, 141 N. W. 1049, 45 L. R. A., N. S., 181; Crouch v. National Livestock Remedy Co., 210 Iowa 849, 231 N. W. 323; Wood v. Wood, 220 Iowa 441, 444, 262 N. W. 773.

Defendant did not except to the instruction and says in argument it has no quarrel with it. The instruction includes the statement, in substance, controlling effect need not be given the opinions of experts although they may not be arbitrarily rejected.

Defendant contends that because the opinions of Professor Waterman and Mr. Brown purport to be based on data as to distances, elevations and river stages the verdict here is contrary to undisputed physical facts. We think, however, the so-called

966

"physical facts rule" defendant invokes is not applicable here and did not entitle it to a directed verdict.

The decisions cited last above support our conclusions on this phase of the case.

IV. Defendant complains of the receipt in evidence of Exhibit P-2 which purports to be a certified copy of records in the Des Moines office of the United States Weather Bureau showing the river stage at Ottumwa on six occasions of high water between May 31, 1903, and June 19, 1944. The exhibit is signed by H. C. S. Thom, senior meteorologist in charge, as custodian of the records.

After Exhibit P-2 had been read to the jury early in the trial defendant as part of its case offered testimony by Mr. Thom that the river stage of 24.8 feet for May 31, 1903, shown on the exhibit is not substantiated by records in his office but was taken from an official bulletin gotten out by such office under Mr. Thom's predecessor as head meteorologist. Defendant then moved to exclude Exhibit P-2 because it appeared from Mr. Thom's testimony the figure given for May 31, 1903, was not certified from an official record. The motion was overruled.

Admission of Exhibit P-2 and refusal to exclude it, under the circumstances here, do not constitute reversible error. There seems to be no controversy as to the river stage on the five occasions shown by the exhibit other than May 31, 1903. Three of these five stages appear on other exhibits offered by defendant and two of the three are also shown by oral testimony of defendant's witness Crawford. Mr. Brown has been superintendent of defendant's plant since February 1912, and seems to have closely watched the river stage in times of high water. No effort was made to show the incorrectness of Exhibit P-2 except as to the river stage for May 31, 1903. Mr. Thom does not deny he certified the exhibit as true copies of the records of his office.

There is much testimony, including that of Mr. Brown, that the highest river stage at the time of the 1903 flood was 20.7 feet rather than 24.8 as shown by Exhibit P-2. Any uncertainty as to the exact figure for 1903 is apparently due to the fact, testified by Mr. Thom, that the weather bureau had no official observer of river stages in Ottumwa in 1903. The testimony

fully explains how the figure 24.8 came to be inserted in Exhibit P-2. The evidence, including defendant's, is all to the effect the river stage during the 1903 flood was the highest within memory. Defendant's Exhibit D-37 states it is reported as the highest stage since 1850.

Even if the river stage in 1903 did not exceed 20.7 as contended by defendant, it was still 7.4 feet higher than on the morning of May 23, 1944, and 3 feet higher than on the evening of May 24 at the time of the flood here in question. Under these circumstances there could have been little if any prejudice to defendant from Exhibit P-2.

When offered, the exhibit seems to have been properly received under section 622.43, Code, 1946, which applies to "Duly certified copies of all records and entries or papers belonging to any public office * * *." Mr. Thom's subsequent testimony was a matter for consideration by the jury, along with Exhibit P-2, but the court was not required because of such testimony to exclude the exhibit. See 7 Wigmore on Evidence, Third Ed., section 2135; 32 C. J. S., Evidence, section 625, page 477.

█ It was not reversible error to refuse defendant's fifteenth requested instruction which states Exhibit P-2 is not conclusive upon plaintiffs' claim that the river stage was 24.8 on May 31, 1903, and that Mr. Thom's testimony should be considered in determining the weight to be given this exhibit. The practice of setting out in an instruction testimony on which one party relies is not to be commended because it tends to give undue prominence thereto. State v. Dunne, 234 Iowa 1185, 1194, 15 N. W. 2d 296, 301, and citations; 53 Am. Jur., Trial, sections 566, 567. The court's instructions upon the weight of the evidence were sufficient.

█ V. Defendant argues it was error to submit the case to the jury under the res ipsa loquitur doctrine invoked by division 2 of the various counts because plaintiff offered evidence in support of one of the specific charges of negligence contained in division 1 and such charge was submitted to the jury. We think, however, the mere introduction of evidence to support this specific charge and the submission thereof to the jury did not deprive plaintiff of the right to have submitted to the jury

968

the res ipsa doctrine in support of the general allegation of negligence contained in division 2, provided such doctrine is properly applicable to the case.

While no Iowa decision is direct authority for our conclusion, we have held several times it is proper to allege specific negligence in one count and to invoke the res ipsa doctrine by alleging general negligence in another count. (Here of course the divisions of the various counts are themselves equivalent to counts.) Rauch v. Des Moines Elec. Co., 206 Iowa 309, 313, 218 N. W. 340; Crozier v. Hawkeye Stages, 209 Iowa 313, 320, 228 N. W. 320; Sutcliffe v. Fort Dodge Gas & Elec. Co., 218 Iowa 1386, 1393, 257 N. W. 406; Pearson v. Butts, 224 Iowa 376, 379, 276 N. W. 65. The petition here is patterned after these decisions. Intimations in the Rauch case and especially the Crozier case, both supra, support our conclusion here.

If a plaintiff is permitted to plead in separate counts both specific negligence and general negligence as a basis for the application of the res ipsa doctrine the mere introduction of evidence to support the specific allegations or the submission thereof to the jury should not render such doctrine inapplicable. Not until the jury has spoken can it be known whether plaintiff has succeeded in establishing the specific negligence charged.

For numerous cases which hold that alleging specific negligence does not preclude reliance upon res ipsa loquitur where general negligence is also alleged, see annotations 79 A. L. R. 48, 59; 160 A. L. R. 1450, 1464. See also 38 Am. Jur., Negligence, sections 263, 305; 45 C. J., Negligence, section 786, page 1228. That the mere introduction of evidence of specific negligence does not prevent resort to the res ipsa rule under general allegations, see Cassady v. Old Colony St. Ry. Co., 184 Mass. 156, 68 N. E. 10, 12, 63 L. R. A. 285; Partin's Admr. v. Black Mountain Corp., 248 Ky. 32, 58 S. W. 2d 234, 93 A. L. R. 606, and annotation 609; 38 Am. Jur., Negligence, section 299, page 996; 45 C. J., Negligence, section 774, page 1207.

Where the precise cause of the injury clearly appears or is beyond dispute, of course there is no room for inference and the res ipsa rule has no application. See authorities last above. However it cannot be said here the cause of the overflow from the race is established beyond doubt.

Submission of both divisions to the jury here, provided of course the evidence gives rise to the res ipsa doctrine, finds support on principle in decisions that a plaintiff is entitled to join and have submitted to the jury, if there is sufficient supporting testimony, a count based on express contract and one bottomed on quantum meruit. Donahoe v. Gagen, 217 Iowa 88, 250 N. W. 892, and citations; Russell v. Clemens & Co., 196 Iowa 1121, 195 N. W. 1009. Wells v. Wildin, 224 Iowa 913, 277 N. W. 308, 115 A. L. R. 169, is a like decision where one count was based on the theory plaintiff was a guest entitled to recover for recklessness and the other count on the theory he was not a guest and could recover for mere negligence.

VI. There remains defendant's contention the res ipsa doctrine is not applicable to the case.

Under this doctrine, where injury occurs by instrumentalities under the exclusive control and management of defendant and the occurrence is such as in the ordinary course of things would not happen if reasonable care had been used, the happening of the injury permits but does not compel an inference that defendant was negligent. See Orr v. Des Moines Elec. L. Co., 207 Iowa 1149, 1154, 222 N. W. 560; Sutcliffe v. Fort Dodge Gas & Elec. Co., supra, 218 Iowa 1386, 1394, 257 N. W. 406; Pearson v. Butts, supra, 224 Iowa 376, 380, 276 N. W. 65; Highland Golf Club v. Sinclair Refining Co., 8 Cir., Iowa, 59 F. Supp. 911, 915 (Judge Graven); annotations 53 A. L. R. 1494; 167 A. L. R. 658, 665; 38 Am. Jur., Negligence, section 295.

The res ipsa rule should not be confused with the proposition that negligence, like other facts, may be proven by circumstantial evidence. Existence of circumstantial evidence of negligence in a particular case does not mean the res ipsa doctrine is applicable in that case. Nor does rejection of such doctrine in a given case mean that negligence may not be established in that case by circumstantial evidence.

In considering the applicability of res ipsa loquitur, the question whether the particular occurrence is such as would not happen if reasonable care had been used rests on common experience and not at all on evidence in the particular case that tends in itself to show such occurrence was in fact the result of neg-

ligence. Kapros v. Pierce Oil Corp., 324 Mo. 992, 25 S. W. 2d 777, 78 A. L. R. 722, 729, and annotation 731; Eickhoff v. Beard-Laney, 199 S. C. 500, 20 S. E. 2d 153, 141 A. L. R. 1010, and annotation 1016; Waddell v. Woods, 158 Kan. 469, 148 P. 2d 1016, 152 A. L. R. 629, 634; annotation 59 A. L. R. 468; 38 Am. Jur., Negligence, section 297; 45 C. J., Negligence, section 778.

 Here the physical cause of plaintiff's damage was overflow from the race. Defendant's answer admits the race, hydroelectric plant and gates were under its exclusive control and management although it denies the res ipsa doctrine is applicable. Although defendant was in exclusive control of the race and gates, it cannot fairly be said the floodwater flowing into the race from the river was *exclusively* under defendant's control and management. Such floodwater is one of the instrumentalities that caused the damage.

Our decisions involving the res ipsa rule have uniformly stressed the necessity of defendant's complete and exclusive control of the instrumentalities that cause the injury. Pierce v. Gruben, 237 Iowa 329, 347, 21 N. W. 2d 881, 889, 19 N. C. C. A., N. S., 73; Whetstine v. Moravec, 228 Iowa 352, 368, 291 N. W. 425; Highland Golf Club v. Sinclair Refining Co., supra, 8 Cir., Iowa, 59 F. Supp. 911, 915.

Further, we think it may not fairly be said that in the ordinary course of things or, as frequently stated, according to common experience, water does not overflow the banks of such a race where those in control of the race exercise reasonable care. Evidence which may show negligence in this particular case is not to be considered in determining this question.

Certainly it is common experience for natural watercourses to overflow their banks in time of heavy rains without lack of care by any human agency. Flooding of lowlands along swollen streams in wet seasons is common. It appears here the Des Moines River overflowed its banks and flooded other portions of Ottumwa at this particular time. Turkey Island and territory on all sides of it were under water. The dams were scarcely visible. That the water which caused the damage here escaped from an artificial channel that carries water from the river rather than from

the river itself seems insufficient basis for an inference the occurrence was the result of negligence.

No authority has come to our attention that would support a holding this is a res ipsa case. City Water Power Co. v. City of Fergus Falls, supra, 113 Minn. 33, 128 N. W. 817, 32 L. R. A., N. S., 59, Ann. Cas. 1912A 108, holds merely that the petition, if amended to allege negligence, stated a cause of action under the res ipsa doctrine for damages from flooding when defendant's dam "suddenly and without previous warning gave way." So far as the opinion discloses, it was not a time of heavy rains.

Willie v. Minnesota Power & Light Co., 190 Minn. 95, 250 N. W. 809, seems to hold, although not clearly so, res ipsa loquitur applied where damage resulted from flooding caused by partial breakage of a dam which necessitated the opening of the floodgate.

In addition to these two Minnesota decisions, plaintiffs cite Weaver Mercantile Co. v. Thurmond, 68 W. Va. 530, 70 S. E. 126, 33 L. R. A., N. S., 1061, and Wigal v. City of Parkersburg, 74 W. Va. 25, 81 S. E. 554, 52 L. R. A., N. S., 465, which apply res ipsa loquitur where flooding was caused by bursting of large water tanks on hillsides.

These Minnesota and West Virginia decisions more nearly than does the case at bar resemble the category of cases which apply res ipsa loquitur where damage is caused by collapsing structures. It is significant too that both the Minnesota and West Virginia courts have looked with favor upon the English decision in Rylands v. Fletcher, L. R., 3 H. L. 330, 1 Eng. Rul. Cas. 236, which imposes liability irrespective of negligence for damage from artificially stored water, although in most states this decision is now regarded as unsound. See City Water Power Co. v. City of Fergus Falls, supra; 56 Am. Jur., Waters, section 167; 67 C. J., Waters, section 356.

Decisions are not uniform as to whether res ipsa loquitur applies where damage is caused by breakage of an underground water pipe. See Foltis v. City of New York, 287 N. Y. 108, 38 N. E. 2d 455, 153 A. L. R. 1122, where the doctrine is held applicable. Contra is Goldman v. City of Boston, 274 Mass. 329, 174 N. E. 686. See also 56 Am. Jur., Waterworks, section 38; note, Ann. Cas. 1916C 1050, 1051.

The underlying reason for the res ipsa rule or, as Dean Wigmore expresses it, "the particular force and justice" thereof, is "that the chief evidence of the true cause * * * is practically accessible to him [defendant] but inaccessible to the injured person." See 9 Wigmore on Evidence, Third Ed., section 2509, pages 380–384; Pierce v. Gruben, supra, 237 Iowa 329, 346, 21 N. W. 2d 881, 889, 19 N. C. C. A., N. S., 73; Savery v. Kist, 234 Iowa 98, 103, 11 N. W. 2d 23, 25; Fink v. New York Cent. R. Co., 144 Ohio St. 1, 56 N. E. 2d 456, 458; annotation 169 A. L. R. 953, 969–972; 38 Am. Jur., Negligence, section 299; 45 C. J., Negligence, section 773.

It does not appear that the chief evidence of the cause of the overflow from the race was accessible to defendant but inaccessible to plaintiffs. Apparently such evidence was equally accessible to plaintiffs as to defendant. The underlying reason for the application of the res ipsa rule is therefore not here present.

Further, we think there was error, of which proper complaint has been made, in the manner of submitting the res ipsa rule to the jury, if the doctrine were here applicable. Instruction No. 12, in effect, makes such rule applicable to the specific charge of negligence made in division 1 of the various counts and submitted to the jury thereunder. This is contrary to our decisions that res ipsa loquitur may not be invoked in aid of specific charges of negligence. See Rauch v. Des Moines Elec. Co., supra, 206 Iowa 309, 313, 218 N. W. 340, and citations; Orr v. Des Moines Elec. L. Co., supra, 207 Iowa 1149, 1156, 222 N. W. 560; Bauer v. Reavell, 219 Iowa 1212, 1219, 260 N. W. 39; Luther v. Jones, 220 Iowa 95, 99, 100, 261 N. W. 817.

The conclusions stated in this division require a reversal.— Reversed.

HAYS, C. J., and BLISS, OLIVER, HALE, WENNERSTRUM, SMITH, and MULRONEY, JJ., concur.

MANTZ, J., not sitting.